231 So.2d 823 (1970)
B. Roy GIBSON, Jr., and St. Joseph Telephone and Telegraph Company, a Corporation under the Laws of Florida, Petitioners,
v.
Joseph A. MALONEY, d/b/a the Apalachicola Times, Respondent.
No. 37914.
Supreme Court of Florida.
January 28, 1970.
Rehearing Denied March 2, 1970.
Ford L. Thompson, of Thompson & Wadsworth, Tallahassee, and Charles S. Isler, Jr., of Isler, Welch, Bryant, Smith & Higby, Panama City, for petitioners.
J. Ben Watkins, of Truett & Watkins, Miami, for respondent.
*824 ADKINS, Justice.
This cause is before the Court for review on conflict certiorari of the decision of the District Court of Appeal, First District, reported in Gibson v. Maloney, Fla. App., 214 So.2d 89. It is conflict of decisions, not conflict of opinions or reasons that supplies jurisdiction for review by certiorari. Fla. Const., Art. V, § 4(2), F.S.A. When comparing decisions it may be necessary to consult the record to some extent. Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965).
The record clearly shows that appellees acquired a small weekly newspaper in Apalachicola, Florida, and immediately started a news and editorial campaign against the Alfred I. duPont interests and its affiliates, St. Joe Paper Company and St. Joseph Telephone and Telegraph Company. Samples of the publications in the record demonstrate an attempt to harass and abuse the duPont interests, apparently for the purpose of convincing the public that these interests were some sort of evil influence in the community of Apalachicola and that it would therefore not be a good place to live and do business.
At a meeting of the Rotary Club in Port St. Joe, located a short distance from Apalachicola, one Gibson, President of St. Joseph Telephone and Telegraph Company, addressed the Rotary Club commenting generally on development of the area, and in his remarks said:
"Now, I shall take Apalachicola: Our exchange there in the year 1964 lost 74 telephones  only exchange that we have that showed any loss in telephones  and, in my opinion, this loss can be attributed largely to the local newspaper in Apalachicola and its publisher, who seems to take pleasure in berating and abusing any business interest in his community, including the larger taxpayers in this County; and, in my opinion, frequently, in referring to the Alfred I. duPont Estate and its various interests, not only vents his displeasure, venom, and, in some instances, outright falsehoods  this in spite of the fact that the interests of the Alfred I. duPont Estate are one of the largest taxpayers in the County.
* * * * * *
"In closing, I shall simply say that I think we in Port St. Joe, and in all of the communities where the St. Joseph Telephone & Telegraph Company furnishes telephone services  with the exception of Apalachicola  are fortunate in having newspapers, in their communities, or near them, that welcome and invite business and industry. Business and industry do not go where they are unwanted and vilified, but where they are wanted and invited."
Subsequently, Maloney, as a publisher and editor of the Apalachicola Times, the only newspaper published in the County, filed suit against Gibson and St. Joseph Telephone and Telegraph Company for slander and libel, and at conclusion of a trial Maloney was awarded damages in the amount of $15,000.00 against defendants, which award was affirmed by the District Court of Appeal, First District, the decision appearing as Gibson v. Apalachicola Times, 214 So.2d 89. During the course of the trial defendants requested certain charges anchored to the decision of the Supreme Court of the United States in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, defining the limitations and requirements for recovery against public figures. The charges were refused by the trial court.
There can be little doubt that Maloney entered the area and established the anti-duPont editorial policy of his Apalachicola Times, for the purpose of arousing public indignation against these interests, and by virtue of that made himself a public figure engaged in a public enterprise and for the purpose, among other things, of influencing public opinion. He became a part of the passing scene and therefore subject to fair comment. The case is *825 clearly controlled, and a reversal called for, by the decision of this court in Abrams v. Odham, 89 So.2d 334 (Fla. 1956). In that case Abrams had entered the publishing business much as Maloney did, for the purpose, among other things, of influencing opinion to his will by the publishing of a so-called political poll with limited circulation. After his poll had down-graded candidate Odham, Odham struck back by calling Abrams a "phoney pollster", as a result of which Abrams sued Odham and a newspaper publishing his remarks. In disposing of that case this Court said:
"We agree with the trial judge that in these circumstances the remarks of the defendant Odham, even though defamatory, were qualifiedly privileged, for which there is no liability in the absence of express malice. The plaintiff injected himself into the 1954 gubernatorial campaign and made derogatory remarks respecting the defendant Odham's candidacy. The defendant Odham had an interest in defending and a right to defend his candidacy, and his remarks in rebuttal to those of the plaintiff were directed to persons having a corresponding interest, right, or duty, and were made upon an occasion to properly serve such right, interest or duty, within the rule stated in Abraham v. Baldwin, 52 Fla. 151, 42 So. 591, 10 L.R.A., N.S. 1051, as to qualifiedly privileged communications. * * * (Emphasis added.)
* * * * * *
"It should first be noted that in cases of qualified privilege, `the presumption which attends cases not so privileged of malice from the publication of libelous language does not prevail. The burden of proof is changed, and, in order for the plaintiff to recover he is called upon affirmatively and expressly to show malice in the publisher.' Coogler v. Rhodes, 38 Fla. 240, 21 So. 109, 112. If the uncontroverted facts are equally consistent with either the existence or nonexistence of malice, there can be no recovery, for `there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged publication.' Myers v. Hodges, 53 Fla. 197, 44 So. 357, 365. Evidence of malice may be either intrinsic, that is, inferable from the very nature of the defamatory language itself, or extrinsic. Myers v. Hodges, supra, 53 Fla. 197, 44 So. 357. But while malice may be inferred from the nature of the communication itself, it cannot be inferred from the mere fact that the statements are untrue. Coogler v. Rhodes, supra, 38 Fla. 240, 21 So. 109."
Actually, we need go no further to reverse the case sub judice than the Abrams case. However, this Court in Jacova v. Southern Radio and Television Company, Fla., 83 So.2d 34, in denying a claim by Jacova who had made himself an actor in a newsworthy event, said:
"* * * Or, as stated by some courts, `Where one, whether willingly or not, becomes an actor in an occurrence of public or general interest, he emerges from his seclusion, and it is not an invasion of his "right of privacy" to publish his photograph with an account of such occurrence.' Metter v. Los Angeles Examiner, 1939, 35 Cal. App.2d 304, 95 P.2d 491. Accord: Jones v. Herald Post Co., 1929, 230 Ky. 227, 18 S.W.2d 972; Berg v. Minneapolis Star & Tribune Co., D.C.Minn. 1948, 79 F. Supp. 957."
In New York Times Company v. Sullivan, supra, the Supreme Court of the United States said:
"The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, `was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Roth v. United *826 States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498. `The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117. `[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.' Bridges v. California, 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192 and this opportunity is to be afforded for `vigorous advocacy' no less than `abstract discussion.' N.A.A.C.P. v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405.
"The First Amendment, said Judge Learned Hand, `presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.' United States v. Associated Press, 52 F. Supp. 362, 372 (D.C.S.D.N.Y. 1943).
* * * * * *
"Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. See Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131; De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278."
What the public knows generally the courts are presumed to know, and we therefore are aware that the underlying policy of Rotary Clubs is to support the normal growth of their respective communities. It was therefore fitting and proper that at such a public meeting the failure of a segment of the community to grow and the apparent reason for it not growing should be freely discussed. Therefore, under the command of the Abrams, Jocova and Sullivan cases, the comment made by Gibson was "fair comment" on a public matter relating in part to an individual who had by choice made himself newsworthy and a part of the passing scene.
The decision of the District Court of Appeal under review is quashed and the cause is remanded to the District Court of Appeal with instructions that said cause be further remanded for a new trial upon proper instructions.
DREW, CARLTON and BOYD, JJ., concur.
ERVIN, C.J., and THORNAL, J., dissent with opinions.
THORNAL, Justice (dissenting).
I must respectfully dissent from the opinion of my brethren. I do not find the facts to be exactly as stated by them, nor do I find any basis for jurisdiction in this Court which justifies consideration of the merits. Despite this barrier, I have reviewed the merits and have concluded that there is no factual support for the conclusion they reach.
In my view the majority opinion is factually, and in some instances diametrically, contrary to the record.
Nowhere in the record is there even an inference "that appellees acquired a small weekly newspaper in Apalachicola, Florida, and immediately started a news and editorial campaign against Alfred I. duPont interests and its affiliates, St. Joseph Paper Company and St. Joseph Telephone and Telegraph Company." This finding is purely an assumption and I find no testimony to support it. Furthermore, *827 even if this were true, I am unable to comprehend the relevance to the case. The question is whether Mr. Maloney was slandered and libeled by the petitioners, and not whether they have a cause of action against Mr. Maloney for what he said about them in his newspaper.
The majority opinion also fails to mention that Mr. Gibson made statements about how Mr. Maloney drove business and people from the Apalachicola area which Mr. Gibson did know, or should have known, were false when he made them. Nowhere does the majority state that after Mr. Gibson made his speech, its text was mailed out by the St. Joseph Telephone and Telegraph Company to its subscribers, which action a diligent jury could find compounded the damage to Mr. Maloney. Undoubtedly, this is what the jury did find as they awarded Mr. Maloney $5,000 against the St. Joseph Telephone and Telegraph Company for punitive damages. The majority does not mention punitive damages were awarded.
In citing Abram v. Odham, 89 So.2d 334 (Fla. 1956), for conflict, I think the majority erroneously interprets what this Court actually held in that case. The Abram case will be more thoroughly dissected later in my dissent, but in passing it should be pointed out that this Court ruled AGAINST Mr. Odham and not for him as the majority opinion could cause a reader to believe.
Lastly, in its conclusion the majority remands this cause to the District Court of Appeal to be remanded to the trial court for a new trial with new jury instructions. How is a new trial possible when in the next-to-last paragraph the majority holds that what Mr. Gibson stated at the Rotary Club meeting was "fair comment?" If it was "fair comment," then, how can Mr. Maloney win his case for libel and slander? "Fair comment" erases any possible trace of malice which is vital for recovery. It seems to me that the majority opinion is in conflict with itself.
Despite the possibility of being repetitive, I think the facts should again be completely reviewed. To insure that I do so without error, I shall quote directly from the record when possible.
Respondent Maloney's cause of action is succinctly set out in his amended complaint filed September 28, 1966.
"2. Defendant B. Roy Gibson, Jr., individually, and in his capacity as Vice President of Defendant ST. JOSEPH TELEPHONE TELEGRAPH COMPANY, did commit a slander per se against Plaintiff, JOSEPH A. MALONEY, on April 29, 1965, when in an address delivered before the Port St. Joe Rotary Club at its weekly meeting he did willfully and intentionally issue words and statements which would subject or attempt to subject Plaintiff to hatred, distrust, contempt, or disgrace and were intended and did injure Plaintiff in and about his trade or profession as a newspaper publisher and editor. Such words or statements by Defendant did impute to Plaintiff conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade or profession; such words or statements were known to Defendant to be untrue and did in their natural meaning and context accuse Plaintiff of dishonesty in and about his business activities and profession.
"3. Such words or statements which gave rise to this slander per se were:
`Now, I shall take Apalachicola: Our exchange there in the year 1964 lost 74 telephones  only exchange that we have that showed any loss in telephones  and, in my opinion, this loss can be attributed largely to the local newspaper in Apalachicola and its publisher, who seems to take pleasure in berating and abusing any business interest in his community, including the larger taxpayers in his County; and, in my opinion frequently, in referring to the Alfred I duPont Estate and its *828 various interests, not only vents his displeasure, venom, and, in some instances, outright falsehoods  this in spite of the fact that the interests of the Alfred I. DuPont Estate are one of the largest taxpayers in the county.'
`In closing, I shall simply say that I think we in Port St. Joe, and in all of the communities where the St. Joseph Telephone and Telegraph Company furnishes telephone services  with the exception of Apalachicola  are fortunate in having newspapers, in their communities, or near them, that welcome and invite business and industry. Business and industry do not go where they are unwanted and vilified, but where they are wanted and invited.'
"4. Further this Defendant, individually and as an officer of Defendant ST. JOSEPH TELEPHONE AND TELEGRAPH COMPANY, did commit a libel per se against Plaintiff by having such untrue and malicious words and statements printed and distributed to all subscribers of this franchised Defendant in eight counties in which Defendant has a franchise for telephone service; and that such publication of the false and misleading words and statements did compound and multiply the injury and damage already done to Plaintiff by such untrue and viscous remarks; that such republication and distribution to the captive subscribers of a franchise service further intended to subject Plaintiff to distrust, ridicule, contempt or disgrace and to injure him in his trade and profession and to accuse him of `outright falsehoods' in and about his business and profession as a newspaper publisher and editor." (emphasis added.)
During the trial, several witnesses called by the plaintiff testified to being shocked at the charges leveled against Mr. Maloney by Mr. Gibson. Some witnesses testified that Mr. Maloney was a civic leader in the community, who had gone to Washington on many occasions to encourage Federal Government spending in the Apalachicola area. Several business leaders testified that Mr. Maloney had worked hard and used his own funds to bring businesses into the area. Mr. Gibson himself testified that he knew of no businesses which Mr. Maloney had actually driven away from the Apalachicola area. But more importantly, Mr. Gibson stated that during the year of 1964, the St. Joseph Telephone & Telegraph Company had transferred ninety-three (93) telephone subscribers from the Apalachicola exchange to a new East Point exchange. Thus, what appeared to be a loss of seventy-four (74) subscribers who had moved from the area turned out to be an actual gain of nineteen (19) subscribers. Mr. Gibson further admitted that he had never made any effort to tell anyone about the new exchange.
Judge Willis gave extensive jury instructions concerning the law on libel and slander:
"Gentlemen, the charge in this case is what we call defamation or slander and libel. Slander and libel are terms referring to a wrongful defamation of the character of another. Slander is defamation that is made by the spoken word orally given and libel refers to such defamation by the making and publishing of written matter. Generally speaking, libel or slander exists where one person maliciously writes or utters false statements about another person in such a manner that it has a tendency to injure another person in his business or occupation. The burden of proof is on the plaintiff to prove by competent evidence to convince you that the defendants, one or more, did in fact slander or libel the plaintiff.
"In instances of a libel which tends to injure another in or about his business or occupation, malice may be implied or inferred from the nature of the article or the words written. Malice may be likewise defined as ill will, hostility or *829 evil intention to defame or injure a person in and about his business or occupation.

"Gentlemen, we do enjoy freedom of speech in this state and our federal constitutions. However, this freedom has some limitations and may not be resorted to defame or damage another person by false and malicious statements of or about him. However, there is a right to express opinions and to make fair comment even though such may tend to reflect adversely on another. The forbidden line is passed by false and malicious statements which damage the reputation of another.

"Every person under the constitution of Florida  and I'm going to read the exact words of the Constitution of Florida  `Every person may fully speak and write his sentiments on all subjects, being responsible for the abuse of that right, and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for libel the truth may be given in evidence to the jury and if it shall appear that the matter charged as libelous is true and was published for good motives, the party shall be acquitted or exonerated.' So, Gentlemen, under the Constitution of our State, whenever there is a charge of defamation, either slander or libel, truth is deemed to be a complete and full defense to slander, and with regard to libel, truth of a publication which is published for good motives is a full defense to libel.
"Now gentlemen, the law affords no redress for mere insults which do not injure reputation. When defamatory matter is published without malice and under circumstances in which the author of the matter has an interest, published to those who have a right to be told, such matter has a qualified privilege."

* * * * * *

"`Slander and libel are terms referring to the wrongful defamation of the character of another. Slander is defamation made by the spoken word orally given and libel refers to such defamation by the making and publishing of written matter. Generally speaking, libel or slander exists when one person maliciously writes or utters false statements about another person in such a manner that it has a tendency to injure another person in his business or occupation. The law affords no redress for mere insults which do not injure reputation and when defamatory matter is published without malice and under circumstances in which the author of the matter has an interest, published to those with a right to be told such matter has a qualified privilege. I think, in summary, that I can state this, that the right to freedom of speech stops when it infringes on the rights of somebody else and one has a right to be secure in his person and in his reputation and not to have that reputation defamed by the utterance of false and malicious statements that causes damage to one's reputation in his business or in his occupation'". (Emphasis added.)
The Jury rendered this verdict:
"`We, the jury, find for the Plaintiff, JOSEPH A. MALONEY, and assess his compensatory damages in the amount of $10,000.

"`We assess his punitive damages against B. ROY GIBSON, JR. in the amount of $ NONE.
"`We assess his punitive damages against ST. JOSEPH TELEPHONE AND TELEGRAPH COMPANY in the amount of $5,000.

"`So say we all.
"`Dated this 27th Day of April, 1967'". (emphasis added.)
On appeal, the District Court of Appeal, First District, after stating the facts, rendered the following opinion:
"As reversible error, appellants urge the trial court's refusal to give certain requested *830 instructions setting forth the need to find malice in the making of a statement to which a qualified privilege attaches. Our review of the record and the instructions given to the jury by the court convinces us that the law in this particular instance was adequately stated to the jury in the court's instructions, and no reversible error has been shown in this respect.

"The remaining point upon which appellants rely for reversal is the sufficiency of the evidence to support the verdict for both compensatory and punitive damages. We cannot say on the basis of the record before us that the jury's verdict was not supported by competent evidence. The test to be applied is not what an appellate court would have decided had they tried the case, but whether or not they can say after reviewing the case that the jury, as reasonable men, could not have found the verdict which they did. See Abraham Used Car Company v. Silva, Fla.App., 208 So.2d 500.
"Appellants having failed to demonstrate reversible error, the judgment of the lower court hereby appealed is affirmed." (Emphasis added.) Gibson v. Maloney, 214 So.2d 89 (1st Dist.Ct.App.Fla. 1968).
Petitioners now seek review by certiorari in this Court, claiming that the District Court's decision is in direct conflict with decisions of this Court or other District Courts of Appeal. Fla. Const. art. V, § 4(2). The majority having issued the writ and heard oral argument, I am now convinced more than ever that the writ should be discharged. I dissented from the order issuing the writ. What petitioners are actually claiming is that the District Court's opinion conflicts with various decisions rendered by the United States Supreme Court. Florida law permits us to take jurisdiction under such circumstances only when the decisions of the United States Supreme Court have been specifically adopted in a Florida decision which involves similar facts and issues. State ex rel. Hawkins v. Board of Control, 83 So.2d 20 (Fla. 1955). Petitioners present no Florida cases where such adoption has occurred.
My colleagues who disagree with me regarding jurisdiction state that they find a direct conflict with two Florida cases: Abram v. Odham, 89 So.2d 334 (Fla. 1956), and Jacova v. Southern Radio and Television Co., 83 So.2d 34 (Fla. 1955). I always respect their judgment, but I must state that I find no such conflict.
In the latter case, Mr. Jacova brought an action based on an invasion of his right of privacy because his picture had been inadvertently telecast as a bystander during a police gambling raid on a cigar store. The case had nothing whatsoever to do with a defamation of character action. There is no possible conflict because the Jacova case has no statements of law in it which are in the least bit pertinent to the case at bar.
Abram v. Odham, supra, does involve a defamation action; however, rather than being in conflict with the case at bar, I find it to be quite consistent. In that case, Mr. Abram was the author and publisher of The Florida Political Survey and Poll, which printed various prognostications and comments concerning Mr. Odham in his campaign for Governor. In his publication, Mr. Abram stated that Mr. Odham appeared to be running second to Mr. Johns. Mr. Odham, obviously offended by such comments, answered Mr. Abram during his campaign, making such statements as "Joe Abram is a phony and his poll is a phony."
In addition, he published and circulated a handbill containing the following matter:
"`You Won't Be Bull-Dozed Or Bluffed By Phoney Pollsters. Have you seen the Joe Abram's "Florida Political Survey and Poll" which reported "Johns leading, Collins coming up fast and Odham slipping?" Joe Abram himself once told Brailey Odham and Jim Etheridge of Tampa just how his poll worked. He *831 said that if Odham would give him (Abram) $1500.00 for 1500 "subscribers" to his survey and poll that he (Abram) would see to it that the Odham "friends" received poll ballots and that would assure Odham of "making a good showing in the poll"'". Id. at 338.
The second defendant in the Abram's action was The Florida Publishing Co., which had quoted several of Mr. Odham's disparaging remarks concerning Mr. Abram in the ordinary course of its operation. This Court ruled that both defendants "were qualifiedly privileged, for which there is no liability in the absence of express malice." Id. at 336. This Court went on to state Florida's law on defamation:

"The rule relative to qualified privilege is, however, subject to the limitation that the parties must act without malice. `When a matter which otherwise would be a qualifiedly privileged communication is published falsely, fraudulently and with express malice and intent to injure the persons against whom it is directed, the communication loses its qualifiedly privileged character and the parties lay themselves liable to a suit for damages in an action of libel or slander.' Loeb v. Geronemus, Fla. 1953, 66 So.2d 241. The plaintiff's complaint contained the usual allegations of falsity and malice on the part of the defendants. So the question then becomes: Do the circumstances disclosed by the complaint negative the allegations of express malice made by the complaint?

"It should first be noted that in cases of qualified privilege, `the presumption which attends cases not so privileged of malice from the publication of libelous language does not prevail. The burden of proof is changed, and, in order for the plaintiff to recover he is called upon affirmatively and expressly to show malice in the publisher.' Coogler v. Rhodes, 38 Fla. 240, 21 So. 109, 112. If the uncontroverted facts are equally consistent with either the existence or non-existence of malice, there can be no recovery, for `there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged publication.' Myers v. Hodges, 53 Fla. 197, 44 So. 357, 365. Evidence of malice may be either intrinsic, that is, inferable from the very nature of the defamatory language itself, or extrinsic. Myers v. Hodges, supra, 53 Fla. 197, 44 So. 357. But while malice may be inferred from the nature of the communication itself, it cannot be inferred from the mere fact that the statements are untrue. Coogler v. Rhodes, supra, 53 Fla. 197, 21 So. 109." (Emphasis added) Id.

Following this statement of law, we held that the newspaper could not be held liable in this defamation action because malice could not be inferred from the mere publishing of Mr. Odham's statements. However, concerning Mr. Odham, just as should be our holding with Mr. Gibson and the St. Joseph Telephone and Telegraph Co. in the case at bar, this Court found that malice could be inferred by a jury from his statements and writings. We quote further:
"It is obvious that these statements of the defendant Odham are much more damaging, intrinsically, to the plaintiff than a general statement that the plaintiff was a `phoney pollster'. As has been noted, malice is not inferable from the mere fact that the statements are untrue, and in order for the plaintiff to recover he must prove express malice. Coogler v. Rhodes, supra [53 Fla. 197] 21 So. 109. But it is our opinion that if the facts published by the defendant Odham in the handbill, quoted above, were, in fact, deliberately fabricated by the defendant Odham, and the jury so found, they would also have the right to infer that this defendant was motivated by purely personal motives of spite and ill will and also to gain the favor of the voters, regardless of the damage caused to plaintiff by the wilfully false statements. *832 Such improper and unjustifiable motives would, in our opinion, justify a finding of malice in fact, on the part of the defendant Odham, so that the communication would lose its qualifiedly privileged character. Loeb v. Geronemus, supra, 66 So.2d 241, 244.

"We hold, then, that as to the defendant Odham the circumstances disclosed by the complaint did not conclusively negative the allegations of express malice made against him by the plaintiff, and that it was therefore error to dismiss the complaint as to this defendant." (emphasis added) Id. at 338.
Thus, from this thorough dissection of Abram v. Odham, supra, it is clear that the law on defamation as stated in that opinion is the same law that Judge Willis charged the jury with in the case at bar.
The two cases are also not factually inconsistent. If malice can be inferred by a jury if it finds that Mr. Odham "deliberately fabricated" statements in his handbills against Mr. Abram, then, certainly, in the case at bar a jury should be allowed to find malice against Mr. Gibson and the St. Joseph Telephone and Telegraph Company for making and publishing statements against Mr. Maloney and his local newspaper which they knew, or should have known, were false. To say that Mr. Maloney was responsible for there being 74 fewer telephone subscribers in the Apalachicola area this year than last when in fact a new exchange had been set up by the telephone company and there were actually MORE subscribers than the year before is analogous to Mr. Odham's actions against Mr. Abram. Thus, the finding of conflict by the majority is anything but clear to me.
I believe it has now firmly been established that this Court is without jurisdiction to render a decision in this case. As was stated in Kyle v. Kyle, 139 So.2d 885 (Fla. 1962):
"The test of our jurisdiction in such situations is not measured simply by our view regarding the correctness of the Court of Appeal decision. On the contrary, jurisdiction to review because of an alleged conflict requires a preliminary determination as to whether the Court of Appeal has announced a decision on a point of law which, if permitted to stand, would be out of harmony with a prior decision of this Court or another Court of Appeal on the same point, thereby generating confusion and instability among the precedents. We have said that conflict must be such that if the later decision and the earlier decision were rendered by the same Court the former would have the effect of overruling the latter." Id. at 887.
This has long been the law of this Court, and I believe it is good law. Seaboard Air Line Railroad Co. v. Branham, 104 So.2d 356 (Fla. 1958). Nielsen v. City of Sarasota, 117 So.2d 731 (Fla. 1960).
The finding of conflict in this case is a perfect example of the malady I warned against in Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965). Here, the majority examined the jury instructions as read by Judge Willis to the jury to find their "direct conflict." These instructions were tested by the facts shown by the meager record sent here. In Foley, the majority stated they could only examine the "record proper" to find a "direct conflict." I have always regarded the "record proper" to mean only the actual pleadings and orders of the case. This would make jury instructions as well as testimony a part of the "transcript of testimony" and not reviewable by this Court to find conflict. The majority is out-Foleying Foley. Just once, it would be helpful if my colleagues who follow the Foley majority would actually define what is meant by "record proper" and "transcript of testimony." There is no clear-cut definition in the books and I think our cases on the subject are extremely confusing.
It appears common law certiorari has returned. By allowing ourselves to examine *833 the "record proper," including the "transcript of testimony," this Court is able to completely circumvent any jurisdictional issue and go right to the merits of each case. If we think the District Court of Appeal reached the wrong conclusion, the majority mysteriously finds some conflict. I think it is plain to see why we are receiving more and more petitions asking us to grant "conflict certiorari." If an attorney will scream the merits of his case long and loud enough, he might always find a conflict somewhere in the "record proper."
Percentage-wise petitions for certiorari in this Court to review decisions of the district courts have doubled between 1958 and 1969. In 1958 we received for review by certiorari 8 1/3% of all cases disposed of by the district Courts. By 1969 this percentage had practically doubled when we received for review 16 1/2% of the total district court dispositions. I predict if this Court keeps finding "direct conflict" at the rate we are moving, that in a relatively short time the District Court of Appeal will cease to be courts of final jurisdiction as intended by our Constitution. The situation today is such that an attorney in Florida almost has a DUTY to his client to seek "conflict certiorari" in this Court if he loses in the District Court of Appeal. We are rapidly approaching the much decried allowance of "two appeals," which concerned the framers of our amended juridical article when it was drafted in 1956.
It will not be long before the entire purpose behind Fla. Const. art. V, § 4(2), as it was amended in 1956, will be defeated. District Courts of Appeal were set up because the people of the State of Florida thought that in so doing those new courts would bring the appellate process closer to the people and that they would alleviate the case-load burden of this Court. The plan was a good one for just as long as we allowed it to be. Our own actions best exemplify what I say. I have no actual count, but it is a safe guess that as we are issuing more writs and hearing more and more cases on "conflict certiorari," we are also disposing of more and more cases by shortform order discharging the writ as being improvidently issued. Why? BECAUSE THE COURT NEVER HAD JURISDICTION IN THE FIRST PLACE. There remains no doubt in my mind that Foley was wrong when announced and the error has been compounded by its continued recognition. It should be scrubbed from the books.
Because my colleagues have examined the merits, I think it is necessary to discuss more than the jurisdictional aspect of this case. Petitioners' basic argument is that error was committed when Judge Willis failed to give their complete requested jury instructions numbers 1, 3 and 6. It should be pointed out that Judge Willis did give much from these instructions to the jury. He did correctly state that recovery for defamation involved more than writing or uttering a false statement. The words "malice", "maliciously", "evil intention", "ill will", "hostility", "wantonness", "outrageousness in conduct," etc. are constantly scattered throughout the jury instructions. However, Judge Willis never mentioned whether Mr. Maloney could be considered a "public figure." Yet, without stating what a "public figure" is, it appears Judge Willis did manage to recite the proper grounds for recovery by a "public figure." The Judge stated falsity was not enough. There must also be malice. While this definition may not be the same as the "actual malice" definition found in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), it appears good enough. Consequently, I cannot find any fault with the actual jury instructions given by the trial judge even if we were to hold Mr. Maloney, a newspaper publisher, is a "public figure."
Accordingly, I would discharge the writ as being improvidently issued. This Court is without jurisdiction and if we reach the merits, there has been no showing that error has occurred.
*834 ERVIN, Chief Justice (dissenting):
I agree with Justice Thornal's dissent, except insofar as it characterizes our decision in Foley v. Weaver Drugs, Inc. (Fla. 1965) 177 So.2d 221, as propounding an undesirable and unwieldy judicial burden of review for this Court.
The petitioners contend that conflict of decisions occurred because the trial judge was affirmed by the District Court in refusing to give requested instructions required by decisions of the United States Supreme Court embracing the need for proof of actual malice under the instant factual situation, which petitioners contend shows plaintiff-respondent is a public figure. Petitioners in effect assert the decision of the District Court generates conflict with decisions of the Florida Supreme Court propounding the proposition that a reviewing court must decide a case on the prevailing law at the time of the rendition of its judgment.
The simple answer to this contention is that our conflict jurisdiction under the Florida Constitution is restricted to reviews of District Court decisions which are in conflict with a decision of the Florida Supreme Court or of another District Court. The Florida Constitution in this regard does not speak in terms of conflict with prevailing law.
I would not be averse to petitioners' proposition, inasmuch as I believe for a State Supreme Court to function as such in a two-tier system of appellate courts, logically such court should have discretionary jurisdiction to review a decision of a District Court, if the manifest justice of a particular case appears to require it. But such is not our conflict jurisdictional scheme.
The majority opinion attempts to bootstrap petitioners' conflict contention by referring to Abram v. Odham (Fla. 1956) 89 So.2d 334 and Jacova v. Southern Radio and Television Co. (Fla. 1955) 83 So.2d 34.
The Jacova decision, for the reasons expressed by Justice Thornal in his dissent, is clearly irrelevant.
The Abram decision dealt with a situation where, under the facts there presented, a qualified privilege was held to attach to the defamatory communication as a matter of law because of the right, duty and interest of the parties and of the recipients of the communication concerning the subject of the defamatory remarks.
Possibly, the majority of the Court thinks the qualified privilege should have been held to attach to the factual situation herein as a matter of law as in the Abram case.
However, in order to reach this conclusion the majority perforce had to read the transcript of the testimony because no facts supportive of such conclusion appear in the District Court's opinion or in the formal records of the case as envisioned in the Foley decision. I digress to say that unlike Justice Thornal I do not gag at searching the transcript of testimony in order to glean conflict from the result of a District Court's decision. This Court has taken conflict jurisdiction on several occasions involving summary judgment and directed verdict issues where District Courts recited the correct rule of law but erred in applying the rule to the factual situation. In many such instances conflict was ascertained by us through inspection of the potentially existing facts evidenced in the transcript of testimony. At any rate, if the above described reason is the moving force behind the majority's finding of conflict in the present case, I think some kind of forthright articulation of the majority's reasoning for this further extension of Foley is in order. If, as of today, we are agreed there is no reason for not considering transcripts of testimony in determining decisional conflict, such agreement and the reasons supportive thereof should be spelled-out and not assumed or reached sub silentio. I see no great problem in respect to the results precipitated by the above described extension of Foley. Usually, the *835 petitioner and the respondent call to our attention in their pleadings or briefs the pertinent facts in the transcript claimed either to generate or not to generate conflict. I do not envision this extension of Foley will overload the Court. Even if it does add to the labors of the Court, the administration of justice will be advanced  this innovation will signify no District Court decision is beyond the pale of review due to the form or background of the District Court decision.
Considering another potential source for the majority's obscure conflict findings in the present case, it is noted the statement was made in Abram that, "if the uncontroverted facts are equally consistent with either the existence or non existence of malice, there can be no recovery." The reason assigned in support of this statement is "there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged publication."
This language in Abram ostensibly suggests that a presumption arises in favor of the defendant in those situations where a qualified privilege is found to exist.
The trial judge in this case instructed the jury that when defamatory matter is published without malice and under circumstances in which the author thereof has an interest to publish it for the benefit of those who have a right to be told, such matter has a qualified privilege.
The interjection of a qualified privilege, as was done in the present case, even assuming the proven existence of same, cannot operate to create a presumption or inference in favor of the defendant that the conditionally privileged communication was made without malice, the reason being that there exists no rational connection between the facts and circumstances giving rise to a qualified privilege, e.g., mutual right, duty and interests of the parties in the subject matter of the communication or acquisition of "public figure" status of plaintiff, and the would-be presumed fact that the communication was made without malice. Thus, where a qualified privilege exists, a plaintiff must prove "express malice" by a preponderance of the evidence, but he need not overcome any inference or presumption of lack of malice in fulfilling this task.
Therefore, it seems clear that when analyzed in its context and against the background of decisional law relating to the area under consideration, the subject language in Abram was not intended to suggest that the existence of a qualified privilege requires a plaintiff to overcome a presumption that the communication was made without malice, but was intended to suggest simply that as a result of the establishment of a qualified privilege, a plaintiff thereupon is required to prove "express malice" without the hindrance or assistance of any presumption.
In the present case, the trial court instructed the jury that the plaintiff had the burden of proving malice. The trial court did not instruct the jury that the plaintiff could rely on any presumption of malice in meeting his burden of proving same. Similarly, the trial court refused to give instructions submitted by the defendant proposing the jury be permitted to presume from the existence of a qualified privilege that the communications were made without malice. Therefore, it seems quite evident the trial judge's instructions properly comported with the law on this point. However, if any confusion is deemed generated by the present case in relation to the language employed in Abram concerning this issue, I suggest it is the Abram decision which warrants clarification and not the application of legal principles to the present set of facts.
The only other potential basis for the majority's finding of conflict or aberration generated by the present case focuses on the failure of the trial judge below to charge the jury that proof of a qualified privilege inuring to the defendant required them to find "express malice" as a condition to the plaintiff's recovery. Even a hasty perusal of the Abram decision reveals *836 the term "express malice" is employed therein to distinguish malice in fact, whether intrinsically or extrinsically inferred, from the legal presumption of malice recognized as attending certain types of defamatory communications. The term "express malice" employed in Abram can safely be equated with the term "actual malice" as defined in the Federal decisions relied on by petitioners in this cause. Therefore, as hereinafter explained, application of the "express malice" test of the Abram decision is not, speaking in terms of substance, a valid reason for reversal. Similarly considered, the "actual malice" criteria derived from Federal decisions (assuming the plaintiff herein as a newspaper publisher acquired a "public figure" status so as to render operative the requirement of actual malice as a condition to recovery; a proposition which can hardly be said to be commanded by the majority's reasoning and which seems to me to be an unwarranted and unrealistic extension of the "public figure" principle so far developed in Federal decisions) is, in terms of substance, not inconsistent with the malice instructions given in this case.
In the present case, the trial judge repeatedly charged the jury that falsity was not enough and that a finding of malice was also required. In defining the type of malice required to be shown by the plaintiff, the jury was instructed as follows:
"In instances of a libel which tends to injure another in or about his business or occupation, malice may be implied from the nature of the article or the words written. Malice may likewise be defined as ill will, hostility or evil intention to defame or injure a person in and about his business or occupation."
The failure of the trial judge in his charge to employ the terms "express malice" or "actual malice" so as to comply with the semantics of the Abram decision and the Federal cases cited by petitioners is not a valid ground for reversing the judgment. This Court has long adhered to the policy of placing substance over form. In view of the instructions given in this case pertaining to the commonly understood meaning of malice and the manner in which it can be shown, I am convinced that application of the above maxim unequivocally reveals the illusory nature of any apparent conflict or aberration thought to be generated by the malice instruction given.
By way of summation, I observe (1) there is no constitutional basis for resorting to Federal authority to establish conflict where such Federal law has not been specifically adopted in the decisional law of this State; (2) the majority has failed to specify the jurisdictional conflict it believes to be generated with the decisional law of this state; (3) all avenues of possible conflict generated by the present case with the decisions cited by the majority are more illusory than real; and (4) the instructions given in this case adequately and substantively comport with controlling principles so as to require affirmation on the merits.