254 So.2d 386 (1971)
TIME, INC., Appellant,
v.
Mary Alice FIRESTONE, Appellee.
No. 70-802.
District Court of Appeal of Florida, Fourth District.
October 28, 1971.
Rehearing Denied December 2, 1971.
*387 Harold R. Medina, Jr., of Cravath, Swaine & Moore, New York City, and William S. Frates and Larry S. Stewart, of Frates, Floyd, Pearson & Stewart, Miami, for appellant.
Robert M. Montgomery, Jr., of Howell, Kirby, Montgomery, D'Aiuto, Dean & Hallowes, West Palm Beach, for appellee.
WALDEN, Judge.
Plaintiff, Mary Alice Firestone, is the ex-wife of the heir to the Firestone rubber fortune. The instant libel action stems from a short article published in Time magazine concerning plaintiff's divorce. The article said plaintiff had been divorced by her husband on grounds of extreme cruelty and adultery.
Plaintiff sued for libel, objecting to the word adultery, because she had received alimony and under Florida Law, F.S. 1967, Section 61.09, F.S.A., an adulterous spouse may not receive alimony. Plaintiff was awarded $100,000. From that award Time appeals.
Time has presented six cogent points on appeal. We have examined all briefs, transcripts and exhibits, listened to oral argument, and researched each point on appeal with care. We conclude that there is merit, to various degrees, to each point on appeal with the exception of number 5, passion and prejudice. Since we find a multitude of reversible error we deem it judicious to only plumb one area, constitutional privilege, better known as the New York Times doctrine.
The doctrine of constitutional privilege in libel began with a holding that public officials could not be libeled in their public duties without proof of actual malice, even if the publication was false. This doctrine was soon expanded to include public figures. The final plateau was reached when the same criteria were held applicable to matters and events of public interest. This last category fits the situation at hand.
1. In capsule, New York Times Company v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, established severe constitutional limits on libel actions brought by public officials. If the defamatory statement was directed at a public official, and concerned the performance of his public duties, the official could recover for libel only by proving actual malice. Actual malice was defined as knowledge of the falsity of your publication or reckless disregard for its truth.
It soon became apparent, however, that since the qualified privilege of New York Times was a constitutional one founded on the first amendment freedoms of speech and press (an amendment said to occupy a top place in the hierarchy of the Bill of Rights) it was impossible to limit its application to public officials.
2. In the cases of Curtis Publishing Co. v. Butts and Associated Press v. Walker, 1967, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, the Supreme Court extended New York Times to include public figures, in these cases a football coach and a general with political prominence. Public figures were defined by Pauling v. National Review, Inc., 1966, 49 Misc.2d 975, 269 N.Y.S.2d 11, as "a private person who publicly, prominently, actively, and as a leader, thrusts himself (however properly) into a public discussion of public and exceedingly controversial questions." Standards for determining public figures were not exact. Each case was decided on its peculiar facts, each figure deemed public by his peculiar actions. See Cepeda v. Cowles Magazines and Broadcasting, Inc., 1968, 9 Cir., 392 F.2d 417; *388 Rose v. Koch, 1967, 278 Minn. 235, 154 N.W.2d 409; Gilberg v. Goffi, 1964, 21 A.D.2d 517, 251 N.Y.S.2d 823; Mason v. Sullivan, 1966, 26 A.D.2d 115, 271 N.Y.S.2d 314; Dempsey v. Time, Incorporated, 1964, 43 Misc.2d 754, 252 N.Y.S.2d 186.
3. The next extension of New York Times began with Time, Inc. v. Hill, 1967, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456. In that case the court applied the Times rule to false reporting of matters of public interest in connection with an action for invasion of the right to privacy. In other words, the right to privacy could be invaded if the public interest was great enough. Hill started a flood of public interest cases, Time, Inc. v. McLaney, 1969, 5 Cir., 406 F.2d 565; Bon Air Hotel, Inc. v. Time, Inc., 1970, 5 Cir., 426 F.2d 858. The result limited libel verdicts severely.
In sum, in order for a public official, public figure or a person involved in an event of great public interest to succeed in a libel action, actual malice must be proven.
Examples of events in the public interest, events where the public's right to know is superior to the individual's right to collect for damaged reputation include police raids for obscene books, organized crime, garbage pickups, pharmaceutical and laboratory testing, and the Master's Golf Tournament. Rosenbloom v. Metromedia, Inc., 1969, 3 Cir., 415 F.2d 892; Wasserman v. Time, Inc., 1970, 138 U.S.App.D.C. 7, 424 F.2d 920; Arizona Biochemical Company v. Hearst Corporation, 1969, D.C.S.D.N.Y., 302 F. Supp. 412; United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 1968, 9 Cir., 404 F.2d 706; Bon Air Hotel, Inc. v. Time, Inc., supra.
Davis v. National Broadcasting Company, 1970, D.C.E.D.La., 320 F. Supp. 1070, discussed some criteria used in determining if the public interest test is applicable.
"* * * A person may become the subject of public interest within the meaning of that rule, although he does not seek to be one, and indeed attempts to avoid it. Thus, a person called to testify unwillingly before a grand jury, a bystander at an event of public importance, or the family of a public official may well be public figures exposed to public comment that is protected by the privilege.
"Hence, as expounded by the decision in Bon Air, the Fifth Circuit Rule is that a publication about any matter of public interest is within the scope of the Times privilege, and hence protected, absent a showing that the publisher knew that the statement was false or had serious doubt about its accuracy."
Rosenbloom v. Metromedia, Inc., 1971, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, mentioned earlier in its lower court posture, was affirmed in a landmark United States Supreme Court case codifying with approval the numerous lower court expansions of New York Times to include matters of public interest. We feel this case is dispositive of our position and represents an authoritative codification of the doctrine of constitutional privilege.
The Rosenbloom facts concerned a police raid searching for obscene books. The court said,
"* * * Our efforts to live and work together in a free society not completely dominated by governmental regulation necessarily encompass far more than politics in a narrow sense. `The guarantees for speech and press are not the preserve of political expression or comment upon public affairs.' Time, Inc. v. Hill, 385 U.S. 374 at 388, 87 S.Ct. 534, 17 L.Ed.2d 456. `Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1941)."

*389 * * * * * *
"Moreover, the constitutional protection was not intended to be limited to matters bearing broadly on issues of responsible government. `[T]he Founders * * * felt that a free press would advance "truth, science, morality, and arts in general" as well as responsible government.' Curtis Publishing Co. v. Butts, 388 U.S., at 147, 87 S.Ct. at 1987 (opinion of Harlan, J.)." (Emphasis supplied except for cites.)
* * * * * *
"* * * The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety. * * * We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." (Emphasis supplied.)
* * * * * *
"* * * `[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.' St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). We thus hold that a libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not. Calculated falsehood, of course, falls outside `the fruitful exercise of the right of free speech.' Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)." (Emphasis supplied except for citations.)
The Supreme Court did not define with exactitude what is in the public interest.
"* * * [w]hether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases." Rosenbloom, supra.
This is a state libel action and it is our delineation that the divorce of Mary Alice Firestone was an event of great public interest. It is even possible plaintiff was a public figure, but we need not go that far to substantiate our result. See Time, Inc. v. Johnston, September 13, 1971, 4 Cir., 448 F.2d 378, for an interpretation of Rosenbloom's language concerning both public figures and events of great public interest.
The divorce trial in our case lasted seventeen months and there was much notoriety connected with it. Due to the social position of the participants and the sensational, colorful testimony at the trial, there was national news coverage.
The Associated Press flashed news of the decree within hours of its issuance. The Miami Herald and the New York Daily News ran articles the next day. They, among other national newspapers, had been following the trial from its inception in their news columns. The fact that Time decided to publish news of the decree in the limited space of its Milestones Column is in itself persuasively indicative of its great reader interest.
Given the divorce's inclusion as an event of great public interest, the only remaining question is one of malice. Only by so proving may plaintiff sustain a recovery. We can find no malice.
Time testified as to the elaborate procedures undertaken to insure the accuracy of its article. There were checks and double *390 checks, quite extensive in scope considering the obvious press of time forced by journalistic deadlines. Nowhere was there proof Time was even negligent, much less intentionally false or in reckless disregard of the truth.
The wording of the divorce decree was ambiguous. At least two reasonable interpretations were available  that plaintiff was found an adulteress as charged in the complaint, or that she was not an adulteress because of the incongruity of such a finding with an award of alimony.
The testimony at trial, some deemed too spicy for public sessions, implicated both parties in compromises to marital fidelity. The wording of the divorce decree itself would lead a reasonable person to conclude adultery had been committed, "[a]ccording to certain testimony in behalf of the defendant, extramarital escapades of the plaintiff were bizarre and of an amatory nature which would have made Dr. Freud's hair curl. Other testimony, in plaintiff's behalf, would indicate that defendant was guilty of bounding from one bedpartner to another with the erotic zest of a satyr." Part of this language was reproduced exactly in Time's article.
In addition to Time's rational interpretation of the pleadings, testimony and decree, it investigated independently at length. It contacted its Miami bureau and its Palm Beach stringer several times by wire and phone to substantiate information. Plaintiff's attorney and the judge were called for verification.
It is, therefore, our conclusion as a matter of fact and law that Time was guilty of no malice, that it took the precautions reasonably required under the circumstances. If the press were charged with correctly analyzing the legal intricacies of each news item, their pages would remain empty of substance. All we can expect is an honest, careful attempt at truth and accuracy. We received it.
It is this court's conclusion that the judgment appealed from should be reversed. Time clearly falls under the New York Times umbrella of protection. The divorce of Mary Alice Firestone was an event of great public interest. There was no evidence of malice on Time's part.
The judgment is reversed and the cause remanded with instructions to enter a final judgment in favor of the appellant, Time, Inc.
Reversed and remanded.
REED, C.J., and OWEN, J., concur.