271 So.2d 745 (1972)
Mary Alice FIRESTONE, Petitioner,
v.
TIME, INC., Respondent.
No. 41868.
Supreme Court of Florida.
December 20, 1972.
*746 Robert M. Montgomery, Jr., of Howell, Kirby, Montgomery, D'Aiuto, Dean and Hallowes, Jacksonville, for petitioner.
William S. Frates and Larry S. Stewart, of Frates, Floyd Pearson, Stewart, Proenza & Richman, Miami, and Harold R. Medina, Jr., of Cravath, Swaine & Moore, New York City, for respondent.
McNULTY, District Judge.
We review this day a libel action arising out of a publication in the "Milestones" column of Time magazine relating to a divorce between petitioner and her husband. Our jurisdiction is predicated on conflict which will hereinafter appear.
The assailed publication is as follows:
"Divorced. By Russell A. Firestone Jr., 41, heir to the tire fortune: Mary Alice Sullivan Firestone, 32, his third wife; a onetime Palm Beach schoolteacher; on grounds of extreme cruelty and adultery; after six years of marriage, one son; in West Palm Beach, Fla. The 17-month intermittent trial produced enough testimony of extra-marital adventures on both sides, said the judge, `to make Dr. Freud's hair curl.'" (Italics added)
The truth is, the divorce was not granted on the grounds of adultery.[1] Furthermore, *747 there was no express finding in the judgment of divorce that either of the parties was guilty of marital infidelity, although the trial judge did allude to testimony offered in that regard and commented thereon in the language quoted in the article. As to this, however, the article failed to note that the trial judge expressly stated that he was "inclined to discount much of this testimony as unreliable."[2]
In any case, in this libel action the District Court reversed a judgment in favor of plaintiff-petitioner, concluding that because the petitioner's ex-husband was an heir to the immense Firestone rubber fortune, and because their divorce action itself together with sensational predivorce marital difficulties had received nationwide publicity, the foregoing publication was constitutionally protected under the First Amendment of the United States Constitution as being "an event of great public interest" within the rationale of the so-called "New York Times doctrine."[3]

I
The paramount question we must answer, therefore, is whether the publication herein, under the circumstances of its making, is thus constitutionally protected. If it is, then the New York Times standard does apply, viz., assuming a defamatory falsehood, petitioner must prove, with convincing clarity, actual malice, i.e., knowledge of the falsity or a reckless disregard of whether it was false or not.[4] If not constitutionally protected, and again assuming a defamatory falsehood, then the publication herein renders respondent amenable under the Florida common law on the subject, to-wit: that a published defamatory falsehood which is libelous per se, unless otherwise privileged,[5] is actionable absolutely and no malice need be shown[6]  truth being the only defense.[7]
As noted, the District Court concluded that the publication herein was constitutionally protected and applied the New York Times standard, supra. We disagree; and herein lies the predicate for jurisdictional conflict. For it is the conflict of decisions, not of opinions or reasons, which supply jurisdiction for review by certiorari.[8] If, therefore, the District Court erroneously categorized the Firestone divorce action as an event of "great *748 public interest" within the discipline of New York Times, and thereby imposed a greater burden on petitioner than would otherwise be the case under settled Florida libel law, then its decision is in conflict with Florida law on the subject which was left unassailed by New York Times and its progeny except to the extent of publication of matters of "great public interest" as that term is correctly construed. We are thus faced with circumscribing "matters of great public interest."

II
To begin with, the term "matters of public or general concern" is more apt, as will become obvious, than the expression "matters of great public interest," and we prefer it. Conceptually, it is public concern which clearly underlies the ratio decidendi of the entire line of Supreme Court cases beginning with New York Times; and the concept was ultimately resolved in Rosenbloom v. Metromedia, Inc, 403 U.S. 29, 91 S.Ct. 1811, 26 L.Ed.2d 296:[9]
"... It is clear that there has emerged from our cases decided since New York Times the concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a `public official,' `public figure,' or `private individual,' as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest. See T. Emerson, The System of Freedom of Expression 531-532, 540 (1970). In that circumstance we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases." (Italics ours)
Now, it is implicit in these decisions, terminating with Metromedia, that not all news items or feature articles are constitutionally protected.[10] It must be taken as true, on the other hand, that "newsworthiness" is that which is well calculated to generate wide reader interest and thus may be a legitimate area of exploitation by the communications media. But we perceive a clear distinction between mere curiosity, or the undeniably prevalent morbid or prurient intrigue with scandal or with the potentially humorous misfortune of others, on the one hand and real public or general concern on the other.
What, then, are matters of real public or general concern? Most obvious, of course, are matters relating to governmental affairs, which necessarily involve public officers, public servants and employees and even candidates for public office. Both the public and private activities of these people, to the extent that they relate to performance of their duties or their qualifications or fitness for public service are clearly matters of public concern.
But public concern is not limited to matters governmental. As was said, again in Metromedia:[11]
"... the constitutional protection was not intended to be limited to matters bearing broadly on issues of responsible government. `[T]he Founders ... felt that a free press would advance "truth, science, morality, and arts in general" *749 as well as responsible government.' [Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)], Id., at 147, 87 S.Ct., at 1987, 18 L.Ed.2d at 1107 (opinion of Harlan, J.). Comments in other cases reiterate this judgment that the First Amendment extends to myriad matters of public interest. In Time, Inc. v. Hill, supra, we had `no doubt that the ... opening of a new play linked to an actual incident, is a matter of public interest,' 385 U.S. 374, at 388, 87 S.Ct. [534] at 542, 17 L.Ed.2d 456 at 467, which was entitled to constitutional protection. Butts held that an alleged `fix' of a college football game was a public issue. Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), a companion case to Butts, established that the public had a similar interest in the events and personalities involved in federal efforts to enforce a court decree ordering the enrollment of a Negro student in the University of Mississippi. Thus, these cases underscore the vitality, as well as the scope, of the `profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' New York Times Co. v. Sullivan, 376 U.S. at 270-271, 84 S.Ct. at 721, 11 L.Ed.2d at 701, 95 A.L.R.2d 1412."
Thus, it appears, it can be broadly said that matters of real public or general concern are those which invoke common and predominant public activity, participation or indulgence, and cogitation, study and debate; and they include such matters as sporting events,[12] the performing and fine arts,[13] morality and religion,[14] the sciences,[15] and matters relating generally to the health, well-being and general comfort of the public as a whole.[16] Accordingly, news items or featured articles or commentaries by communications media relating to these matters are and should be constitutionally protected notwithstanding that obscure or prominent individuals may be caught up in the current and regretfully defamed. That this is the law is again postulated in Metromedia:[17]
"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not `voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety... . We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons *750 involved are famous or anonymous." (Italics added)
A fortiori, if one by his own volition thrusts himself on the passing scene to the extent that he knowingly and consciously wants and needs publicity or public support for his endeavors or activities he surely submits himself to public scrutiny, which oftentimes may justly expose his private affairs as they might relate to the activities or endeavors for which he is seeking public approval.[18] Justice Terrell aptly noted this maxim in Kennett v. Barber:[19]
"... one ... who makes his living by dealing with the public or otherwise seeks public patronage, submits his private character to the scrutiny of those whose patronage he implores, and that they may determine whether it squares with such a standard of integrity and correct morals as warrants their approval. Cason v. Baskin, Fla., 30 So.2d 635."

III
But while we agree to all this, we are nevertheless strongly persuaded from our reading of the cases that a line must be drawn somewhere. For instance, Mr. Justice Brennan said in Metromedia:[20]
"Further reflection over the years since New York Times was decided persuades us that the view of the `public official' or `public figure' as assuming the risk of defamation by voluntarily thrusting himself into the public eye bears little relationship either to the values protected by the First Amendment or to the nature of our society. We have recognized that `[e]xposure of the self to others in varying degrees is a concomitant of life in a civilized community.' Time, Inc. v. Hill, supra, 385 U.S. at 388, 87 S.Ct. at 542, 17 L.Ed.2d at 467. Voluntarily or not, we are all `public' men to some degree."
However, he went on:
"Conversely, some aspects of the lives of even the most public men fall outside the area of matters of public or general concern. See n. 12, supra; Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, 85 S.Ct. 1678 (1965). Thus, the idea that certain `public' figures have voluntarily exposed their entire lives to public inspection, while private individuals have kept theirs carefully shrouded from public view is, at best, a legal fiction. In any event, such a distinction could easily produce the paradoxical result of dampening discussion of issues of public or general concern because they happen to involve private citizens while extending constitutional encouragement to discussion of aspects of the lives of `public figures' that are not in the area of public or general concern." (Italics added)
And even though the court held in that case that the subject matter of the questioned publication therein was clearly a matter of public or general concern, the court in a footnote went out of its way to recognize the point we make here:[21]
"We are not to be understood as implying that no area of a person's activities falls outside the area of public or general interest. We expressly leave open the question of what constitutional standard of proof, if any, controls the enforcement of state libel laws for defamatory falsehoods published or broadcast by news media about a person's activities not within the area of public or general interest." (Italics added)
*751 We hold to the proposition, therefore, that regardless of the prominence of the person defamed there still may be a sector of his private life which is of no real concern to the public; and this private sector should be as zealously protected from defamation as is the right of the public to be concerned, and thus informed, about the public sector of his life.[22]

IV
So recognizing the pre-eminence of real public concern vis a vis the private affairs of the prominent or anonymous individual in terms of First Amendment sanctions, how, then, constitutionally to balance the rights of each to the extent it is legally possible to do so? The problem is a bifurcated one, obviously. We either must determine when or at what point the private activities of a public or prominent figure become the real concern of the public; or, alternatively, we must determine when conduct, or an event or series of events, or an historical occurrence or happening, or other noteworthy and recordable occasion, involves a subject of true public concern.
In either case, we think that as a workable test the question is whether there is a logical relationship between the reported activities of the prominent person, or between the subject matter of the conduct, occasion or event reported or recorded, and the real concern of the public. This is clearly a matter of law, since reasonable men cannot differ on what is logical although logical men may differ on what is reasonable. Thus a publisher need not gamble on whether a given jury may reject as unreasonable his decision that a proposed publication involves a matter of public or general concern. He need only exercise responsible judgment in the premises, which is the least that's expected of him to begin with. He would exploit mere sensationalism at his own risk.
We cannot, of course, nor need we, attempt to hypothesize the manifold factual situations on either side of the question. Suffice it here to make note of the judiciousness suggested in Metromedia: "... the delineation of the reach"`of the term "issue of public or general concern" ought be left to "future cases."[23] This is one of those future cases.

V
We now review the pertinent facts in this case in the light of the foregoing observations. As noted, petitioner and her ex-husband were well known. They were prominent among the "400" of Palm Beach society, and were also active members of the sporting set. Sadly, however, their marital difficulties were equally well known; and the charges and countercharges of meretriciousness, flowing from both sides of the controversy, made their divorce action a veritable cause celebre in social circles across the country. Additionally, as the District Court observed:[24]
"The divorce trial ... lasted seventeen months and ... [d]ue to the social position of the participants and the sensational, colorful testimony at the trial, there was national news coverage.
The Associated Press flashed news of the decree within hours of its issuance. The Miami Herald and the New York Daily News ran articles the next day. They, among other national newspapers, had been following the trial from its inception in their news columns... ."
Finally, on the point of notoriety, it appears that petitioner granted several interviews to news media during the divorce action and allowed herself to be quoted in relation thereto.
*752 But withal, we are committed to the view that neither wealth, social position nor fame, of themselves, render the private affairs of those involved amenable to constitutionally protected unbridled public scrutiny under the guise of public or general interest. That the public was curious, titillated or intrigued with the scandal in the Firestone divorce is beyond doubt. But we again emphasize the distinction we make between that genre of public interest and real public or general concern. Applying the suggested test, where in this case is the logical relationship between the marital difficulties of the Firestones and real public concern? The matter certainly doesn't inhere significantly within the areas of public concern we categorized earlier;[25] and no category otherwise can be articulated except prurient curiosity, which we reject as too frivolous a predicate upon which to expend constitutional energies.
We would arrive at a different conclusion, no doubt, if (as in the celebrated case of a renowned conductor of the London Symphony who was sued for divorce some few weeks after publishing a book offering advice on marital bliss) one or the other of the parties herein were a professional marriage counselor. Obviously, in such case as an illustration, there would be a logical connection between the divorce action and the inquiring concern of the public whose patronage is sought. Likewise, as another and concrete, example, if the divorce were peripherally, or even prominently, alluded to in an expose or feature article essentially exploring some other subject of legitimate public inquiry, such as the expose of widespread wiretapping and "snooping" published in Life magazine which gave rise to another libel action between the parties hereto in the federal courts,[26] there would again be a valid basis for constitutional protection.[27] But we cannot find here any aspect of real public concern, and none has been shown to us, which would be furthered or enhanced by "free discussion" and "robust debate" about the divorce of Russell and Mary Alice Firestone.
Nor did petitioner's quoted interviews with the press raise the untidy affair to the dignity of true public concern. Unlike an actress who might grant interviews relating to the opening of her new play, petitioner was not seeking public patronage. Publicity, or sympathy, perhaps, but not patronage. Irrespective of her subjective motives, objectively she was merely satiating the appetites of a curious press.
In sum, the Firestone divorce action was unquestionably newsworthy, but reports thereof were not constitutionally protected as being matters of real public or general concern.

VI
There may be other reasons, however, to reverse the judgment for petitioner herein. For example, although not constitutionally protected under the New York Times doctrine, the assailed publication herein may be "conditionally privileged" under Florida libel law. That is to say, being a report of *753 a judicial proceeding (one such privileged publication) it may be so privileged within the contemplation of our previous holdings in Walsh v. Miami Herald Publishing Co.[28] and Shiell v. Metropolis Co.[29] This theory of defense was argued by respondent before the District Court along with five other points including the principal one upon which that court finally bottomed its decision. But the court disposed of all these matters by saying:[30]
"Time has presented six cogent points on appeal. We have examined all briefs, transcripts and exhibits, listened to oral argument, and researched each point on appeal with care. We conclude that there is merit, to various degrees, to each point on appeal with the exception of number 5, passion and prejudice. Since we find a multitude of reversible error we deem it judicious to only plumb one area, constitutional privilege, better known as the New York Times doctrine."
Respondent argues essentially the same points here, with the exception of the passion and prejudice point rejected by the District Court. However, we do not decide these points, other than the constitutional one, nor do we concede merit therein. Rather, we deem it more propitious and proper to remand the cause to the District Court which has the entire record before it and is better situated initially to pass on the full merit of the remaining points raised.
Accordingly, certiorari is granted, the decision of the District Court is quashed, and the cause is remanded for further proceedings not inconsistent herewith.
ERVIN, CARLTON and DEKLE, JJ., concur.
ROBERTS, C.J., concurs specially with opinion.
ROBERTS, Chief Justice (concurring specially).
I concur in the opinion and judgment for the reasons stated and for the further reason that the libel was perpetrated by a weekly rather than a daily publication. In Ross v. Gore, 48 So.2d 412 (Fla. 1950), and Jacova v. Southern Radio and Television Company, 83 So.2d 34 (Fla. 1955), this Court commented that daily publications operate against stringent deadlines for the reason that the American public has come to demand "Today's news today". A reporter is expected to determine the facts in a matter of hours or minutes and it is only reasonable to expect that mistakes will be made.
In recognition of this fact, our state legislature has provided in Section 770.02, Florida Statutes, F.S.A., for correction, apology, or retraction by newspaper.
This statutory provision provides as follows:
"If it appears upon the trial that said article was published in good faith, that its falsity was due to an honest mistake of the facts, and that there were reasonable grounds for believing that the statements in said article were true, and that within ten days after the service of said notice a full and fair correction, apology and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, and in as conspicuous place and type as was said original article, then the plaintiff in such case shall recover only actual damages."
This retraction law excuses the newspaper from most of its liability if a simple correction and retraction of the inadvertent misstatement is made by publication in the same editions or corresponding issues of the newspaper.
However, a weekly publication does not have such stringent deadlines as the daily *754 publications and can take the necessary time to fully explore the truth or falsity of a news item.
Section 4 of our Declaration of Rights (Article I, Constitution of Florida) guarantees that, "Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right." In overdramatizing the news item sub judice, the magazine simply closed its eyes to that portion of our constitution which says, "but shall be responsible for the abuse of that right".
The daily newspapers in Florida have not hesitated to retract and correct inadvertent misstatements in accordance with Section 770.02, Florida Statutes, F.S.A. Time, Inc., magazine was afforded the same opportunity, but refused to take advantage of this statutory provision.
NOTES
[1] In reviewing the divorce proceeding on certiorari, this court expressly determined that the trial judge "did not find the wife guilty of adultery." Rather, it was pointed out that the divorce was granted for lack of "domestication," in the language of the trial judge, which of course was not one of the statutory grounds at the time of divorce. We affirmed the decree, nonetheless, but on the ground of "extreme cruelty," the record having fully supported such conclusion and thus necessitating an affirmance. Firestone v. Firestone (Fla. 1972), 263 So.2d 223.
[2] The relevant portion of the final judgment in this regard is set forth as follows:

"According to certain testimony in behalf of the defendant, extra-marital escapades of the plaintiff were bizarre and of an amatory nature which would have made Dr. Freud's hair curl. Other testimony, in plaintiff's behalf, would indicate that defendant was guilty of bounding from one bedpartner to another with the erotic zest of a satyr. The court is inclined to discount much of this testimony as unreliable. Nevertheless, it is the conclusion and finding of the court that neither party is domesticated... ."
[3] See, Time, Inc. v. Firestone (Fla.App. 1971), 254 So.2d 386, citing, New York Times v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.
[4] Id. See, also, St. Amant v. Thompson (1968), 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262.
[5] See, e.g., Hauser v. Urchisin (Fla. 1970), 231 So.2d 6 (absolute privilege for statement by public official in connection with his duties); St. Paul Fire & Marine Ins. Co. v. Icard, Merrill, Cullis & Timm, P.A. (Fla.App. 1967), 196 So.2d 219 (absolute privilege for statements made in judicial proceedings); Walsh v. Miami Herald Publishing Co. (Fla. 1955), 80 So.2d 669 (qualified privilege for reports of judicial proceedings); Murphy v. Daytona Beach Humane Soc. (Fla.App. 1965), 176 So.2d 922 (qualified privilege in commenting on matter of public interest); and Leonard v. Wilson (Fla. 1942), 8 So.2d 12 (qualified privilege for good faith character reports or references).
[6] See, e.g., Teare v. Local Union No. 295 (Fla. 1957), 98 So.2d 79; Hartley & Parker, Inc. v. Copeland (Fla. 1951), 51 So.2d 789; and Commander v. Pedersen (Fla. 1934), 156 So. 337.
[7] See, Fla. Const.D.R. § 4, F.S.A. See, also, Florida Pub. Co. v. Lee (Fla. 1918), 80 So. 245.
[8] See, Gibson v. Maloney (Fla. 1970), 231 So.2d 823. See, also, Fla. Const., Art. V, § 4(2).
[9] (1971), 403 U.S. 29, 44, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296.
[10] If all news were protected, there would, of course, be no need for a "public concern" category. It should be noted, however, that Justice Douglas disagrees and would extend the protection to include all news items. See his concurring opinion in Garrison v. Louisiana (1964), 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125. This view was shared by the late Justice Black and is apparent in his concurring opinion in Metromedia, id., at 57, 91 S.Ct. 1811, 29 L.Ed.2d 296.
[11] Note 9, supra, at 42, 91 S.Ct. at 1819.
[12] See, Time, Inc. v. Johnston (4th Cir.1971), 448 F.2d 378.
[13] See, Time, Inc. v. Hill (1967), 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456; and Man v. Warner Bros., Inc. (S.D.N.Y. 1970), 317 F. Supp. 50.
[14] See, Gospel Spreading Church v. Johnson Pub. Co. (1971), 14 U.S.App.D.C. 207, 454 F.2d 1050; and Spern v. Time, Inc. (W.D.Pa. 1971), 324 F. Supp. 1201.
[15] See, United Med. Laboratories, Inc. v. C.B.S. (9th Cir.1968), 404 F.2d 706.
[16] See, e.g., United Med. Laboratories, Inc. v. C.B.S., note 15, supra (health); Cullen v. Grove Press. Inc. (S.D.N.Y. 1967), 276 F. Supp. 727 (hospital for the criminally insane); Time, Inc. v. Ragano (5th Cir.1970), 427 F.2d 219 (organized crime); DeSalvo v. 20th Century Fox (D.Mass. 1969), 300 F. Supp. 742 (notorious individual crime); Dacey v. Florida Bar, Inc. (5th Cir.1970), 427 F.2d 1292 (probate matters); Cervantes v. Time, Inc. (8th Cir.1972), 464 F.2d 986 (corruption of government official); Novel v. Garrison (N.D.Ill. 1971), 338 F. Supp. 977 (assassination of a president); and Bon Air Hotel, Inc. v. Time, Inc. (5th Cir.1970), 426 F.2d 858 (decline of famous hotel).
[17] Note 9, supra, at 43, 91 S.Ct. at 1819.
[18] See, Ocala Star Banner Co. v. Damron (1971), 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57. See, also, Gibson v. Maloney, note 8, supra.
[19] (Fla. 1947), 159 Fla. 81, 31 So.2d 44, 46.
[20] Note 9, supra, at 47, 91 S.Ct. at 1822.
[21] See, note 12 in Metromedia, note 9 supra, at 44, 91 S.Ct. at 1820.
[22] See, also, Belli v. Orlando Daily Newspapers, Inc. (5th Cir.1967), 389 F.2d 579, 587; and Buckley v. Esquire, Inc. (S.D.N.Y. 1972), 344 F. Supp. 1133.
[23] See, note 9, supra, 91 S.Ct. 1811, 29 L.Ed.2d 296.
[24] Time, Inc. v. Firestone (Fla.App. 1971), 254 So.2d 386, 389.
[25] While marital infidelity is still within the scope of "morality," notwithstanding this "enlightened age," that involved in a given marriage is not, significantly, a matter of any great public importance.
[26] See, Firestone v. Time, Inc. (5th Cir.1972), 460 F.2d 712.
[27] We do not mean to say, however, that a publisher can create his own "matter of public concern" and thereby defame others. We seriously doubt, for example, that Dr. Kinsey without obvious good purpose could have brought into constitutionally protected public focus the identity of those who formed a statistical basis for his "reports." On the other hand, a bona fide and responsible inquiry into the validity of the good doctor's reports (which we certainly don't impliedly impugn) could well in an extreme case subject persons involved in such reports to privileged public exposure. In either case, it is assumed, the resolved issue of "actual malice" would determine any question of "bootstrapping," i.e., creating a springboard from which to merely defame or sensationalize.
[28] (Fla. 1955), 80 So.2d 669.
[29] (Fla. 1931), 136 So. 537.
[30] Time, Inc. v. Firestone (Fla.App. 1971), 254 So.2d 386, 387.