## SEPMEIER, et al. v TALLAHASSEE DEMOCRAT, INC., etc., et al.

### Case No. 83-1924

Second Judicial Circuit, Leon County

September 9, 1986

### APPEARANCES OF COUNSEL

**C. Gary Williams** and **Timothy B. Elliott** for defendant Tallahassee Democrat.

**Mark A. Risi, William E. Gary,** and **C. Bette Wimbish** for plaintiffs.

### OPINION OF THE COURT

J. LEWIS HALL, JR., Circuit Judge.

This cause is before the Court on a Motion for Summary Judgment

filed by Defendants. This Court has considered the entire record,[1] and in summary, finds that Defendants are entitled to a final summary judgment on either of two alternate grounds.[2] First, Plaintiffs are limited purpose public figures so cannot recover without showing through clear and convincing evidence that the Column was published with "actual malice," that is with knowledge of falsity or reckless disregard for truth or falsity. There is no such clear and convincing evidence in this record and, therefore, there is no genuine issue of material fact regarding this point. Second, the Column is conditionally privileged by the common law doctrine of "fair comment" because the undisputed evidence proves that the Column was published in good faith and concerned a matter of public interest or general concern. Plaintiffs have failed to produce any evidence that Defendants acted with "express malice" as is required to overcome this privilege.

## I. *The Factual Background.*

This lawsuit arose more than three years ago out of a commentary written by Columnist Mary Ann Lindley and published in the *Tallahassee Democrat* on May 20, 1983 ("the Column"). The Column dealt, in part, with a message delivery service known as Leathergram. Plaintiff, Fantasy Dancers, Inc., delivered Leathergrams, which were advertised and available to the public. Plaintiff, Faye Sepmeier, is President of Fantasy Dancers, Inc. and performed the Leathergrams. Her husband, Charles W. Sepmeier, is also a Plaintiff. Copies of the Column and a correction published in the *Democrat* the following day are attached as Exhibit "A" and "B."*

On July 12, 1983, Plaintiffs filed a Complaint against the Tallahassee Democrat, Inc. and the following individuals: J. Carrol Dadisman, Publisher; Walker Lundy, Executive Editor; Bill Fuller, Managing Editor; Bill Mansfield, Editorial Page Editor; and Mary Ann Lindley, Columnist.

Plaintiffs' contention was that the Column published by Defendants was defamatory because it falsely implied that Plaintiff Faye Sepmeier performs a striptease act nude, or nearly nude, incident to delivering Leathergram messages.

---

[1] Due consideration has been given to all pleadings, depositions, answers to interrogatories, admissions, supporting and opposing affidavits, the Motion filed by Defendants, the Memoranda of Law, and the extensive oral arguments presented by the parties.

[2] The conclusions on these two points make it unnecessary for this Court to address the remaining issues set forth in Defendants' Motion.

* Exhibits "A" and "B" are not included in publication of this decision.

2

This Court (Judge Rudd presiding) previously dismissed Plaintiff's Complaint in its entirety and with prejudice in a Final Order dated February 2, 1984. The basis for the Order was that the Column was a privileged expression of pure opinion.

In a 2—1 decision, the First District Court of Appeal, in reviewing the pure opinion issue, reversed the Order dismissing the defamation action and remanded the case for further proceedings. *Sepmeier v. Tallahassee Democrat, Inc.*, 461 So.2d 1983 (Fla. 1st DCA 1984). The First District did not consider any of the issues address in this Order, nor were such issues before it.[3]

On remand, Defendants filed their Answer to the Complaint on February 11, 1985 and the parties have had an opportunity to take extensive discovery since that time.

II. *The Applicable Summary Judgment Standard.*

Summary judgment is particularly important in defamation cases in order to avoid the chilling effect of harassment and litigation on the full and free exercise of First Amendment rights. *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1011 (1967); "Perhaps in no other area of civil litigation is the [plaintiff's] burden so ominous as in the law of defamation." *Ragano v. Time, Inc.*, 302 F. Supp. 1005, 1010 (M.D. Fla. 1969), *aff'd*, 427 F.2d 219 (5th Cir. 1970). *See also Kidder v. Anderson*, 354 So.2d 1306, 1310 (La. 1978), *cert. denied*, 439 U.S. 829 (1978) (". . . the burden placed upon a plaintiff in defeating a motion for summary judgment [in a freedom of expression case] is a most severe and difficult challenge to meet, though not impossible.")

Recent United States Supreme Court cases provide guidance as to the applicable standards regarding summary judgment, especially as related to libel cases. Two months ago in *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), the Court noted that under Federal Rule of Civil Procedure 56(c), which

---

[3] It is of no import that Plaintiffs have survived a motion to dismiss before the First District. First, the ground raised by that motion was the defense of pure opinion. Here, among others, it is the privileges of limited purpose public figure and fair comment. Secondly, having survived the motion to dismiss, Plaintiffs have only established the legal sufficiency of their complaint for those grounds raised. Plaintiffs must still establish, on Defendants' Motion for Summary Judgment, through affidavits and other means, that sufficient facts exist to support their action. The First District's opinion cannot be read as affecting this Court's right to decide this and other issues that are properly before it in accordance with proper judicial procedure. Therefore, it was incumbent upon Plaintiffs to properly respond to Defendants' Motion for Summary Judgment.

3

mirrors Florida's Rule of Civil Procedure 1.510(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson*, 91 L. Ed. 2d at 211. The Court noted:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Id.* (emphasis partially added). Only when the dispute about a material fact is "genuine" such that a reasonable jury could return a verdict for the nonmoving party, will summary judgment not lie. The party opposing the motion must present substantial probative evidence to show a genuine issue for trial exists. *Id.* at 212.[4] Therefore, a court must examine the evidence and the standard of proof to be applied at trial.

Thus, as in *Anderson*, where the First Amendment mandates a "clear and convincing" standard in determining whether a genuine issue of "actual malice" exists, the trial judge must determine whether a reasonable factfinder would conclude that the plaintiff had met its burden of showing "actual malice" with clear and convincing clarity. *Id.* The Court further stated:

> When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*. For example, *there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.*

*Id.* at 215 (emphasis added). Likewise, it is not sufficient to simply assert that a jury might disbelieve the defendants' denial of malice. *Id.* at 4759. Instead, the evidence must be such that a jury could reason-

---

[4] This standard mirrors the standard for a directed verdict, whereby a trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. Under both, the inquiry is the same: Whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 91 L. Ed. 2d at 213. It also is no different from the consideration of a motion for acquittal in a criminal case where the beyond-a-reasonable-doubt standard applies and where the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt. *Id.* at 214.

4

ably *find* for the plaintiff, even where the evidence is likely to be within the possession of the defendant, so long as the plaintiff has had full opportunity to conduct discovery. *Id.* at 4760. Summarizing, the court stated:

> In sum, a court ruling on a motion for summary judgment must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that the actual malice has been shown with convincing clarity.

*Id.* at 216.[5]

And, four months ago, the United States Supreme Court in *Philadelphia Newspapers, Inc. v. Hepps,* —— U.S. ——, 106 S. Ct. 1558, 89 L.Ed. 2d 783 (1986), held that where a newspaper publishes speech of public concern (as in the instant case), even a private figure plaintiff cannot recover damages without affirmatively showing that the statements at issue are false. As noted in *Hepps,*

> When the speech is of public concern, but the plaintiff is a private figure, as in Gertz, *the Constitution still supplants the standards of the common law,* but the constitutional requirements are, in at lease some of their range, less forbidding than when the plaintiff is a public figure and the speech if of public concern.

*Id.,* 89 L. Ed. 2d at 792 (emphasis added). Thus, the common law's presumptions of falsity, malice and damage to reputation have now been replaced, at least in matters of public figure/public concern cases, to now requiring the Plaintiff to bear the burden of proving such. *Id.,* 89 L.Ed.2d at 791-92.

---

[5] Florida and general law is consistent with *Anderson.* The Court's obligation is to view "the evidence most favorably to the plaintiff, to determine whether there exists a genuine issue of material fact upon which a reasonable jury could find with convincing clarity that the defendants acted with actual malice." *Lampkin-Asam v. Miami Daily News, Inc.,* 408 So. 2d 666, 668 (Fla. 3d DCA 1982). Generally, the party moving for summary judgment carries the burden of establishing the absence of any genuine issue of material fact. The burden then shifts to the opposing party which must produce specific facts, admissible in evidence, which establish a prima facie case and show that there is a genuine issue for trial. *Harvey Building, Inc. v. Haley,* 175 So.2d 780, 782-83 (Fla. 1965); *Landers v. Milton,* 370 So.2d 368 (Fla. 1979); *Guitar v. Westinghouse Electric Corp.,* 396 F.Supp. 1042, 1052 (S.D.N.Y. 1975), *aff'd,* 438 F.2d 309 (2d Cir. 1976); *Mark v. Seattle Times,* 635 P.2d 1081, 1089 (Wash. 1981), *cert. denied,* 457 U.S. 1124 (1982). The opposing party cannot forestall summary judgment by merely asserting that an issue exists based on unsupported speculation, opinion, or surmise. *Id.; Colon v. Lara,* 389 SO.2d 1070, 1072 (Fla. 3d DCA 1980); *Johnson v. Studstill,* 71 SO.2d 251 (Fla. 1954).

Therefore, because this Court finds Plaintiffs to be public figures and the actual malice standard to apply (see discussion *infra*), this Court must grant summary judgment unless Plaintiffs can show clear and convincing evidence of actual malice and falsity.

### III. *Plaintiffs are Limited Public Figures and Plaintiffs Have Offered no Clear and Convincing Evidence of Actual Malice.*

The first reason that Defendants are entitled to final summary judgment is that Plaintiffs are limited purpose public figures who have failed to produce clear and convincing evidence that Defendants published the Column with "actual malice."

(a) *Public Figure Status.*

The issue of whether Plaintiffs are public or private figures is a matter of law to be determined by the court. *Gadsden County Times, Inc. v. Horne*, 382 So.2d 347, 350 (Fla. 1st DCA 1980). This distinction relates to the standard or degree of fault that a plaintiff must prove in a libel action. The United States Supreme Court has held that a public official may recover for libel only if he proves that the allegedly defamatory statement was made with "actual malice"— that is, with knowledge of its falsity or with reckless disregard of whether it was false or not. *New York Times v. Sullivan*, 376 U.S. 254, 279-280 (1964). The actual malice must be proven with "convincing clarity."[6] This holding was extended to public figures in *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967). *See, e.g., Newton v. Florida Freedom Newspapers, Inc.*, 447 So.2d 906, 907 (Fla. 1st DCA 1984).

In the leading case of *Gertz v. Welch*, 418 U.S. 323 (1974), the United States Supreme Court stated the designation as a public figure:

[M]ay rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure

---

[6] "Convincing clarity" or "clear and convincing proof," *Gertz v. Welch*, 418 U.S. 323 (1974), is a higher level of proof than "preponderance of the evidence" and lower than the criminal standard of "beyond a reasonable doubt." *Nader v. de Toledano*, 408 A.2d 31 (D.C. App. 1979), *cert. denied*, 444 U.S. 1078 (1980), *cited with approval* in *Lampkin-Asam v. Miami Daily News, Inc.*, 408 SO.2d 666, 668 (Fla. 3d DCA 1982). Clear and convincing proof "should produce in mind [sic] of the trier of facts a firm belief or conviction as to the truth of the allegations sought to be established. 32A C.J.S., *Evidence* § 1023.

**6**

for a limited range of issues. In either case, such persons assume special prominence in the resolution of public questions.

*Id.* at 351. The Court noted that the second category or "limited purpose" public figure is more common.

Plaintiffs have cited several cases in addition to *Gertz* for the proposition that, for a person to be a public figure, the circumstances must rise to the level of a public controversy. *See, Arnold v. Taco Properties, Inc.,* 427 So.2d 216, 218 (Fla. 1st DCA 1983); *Bruno v. Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir. 1980), (where a three-prong test was used to determine when a person becomes a public figure in a public controversy). Based on these cases, Plaintiffs argue that no public controversy has been established in which Plaintiffs thrust themselves. However, there are, in fact, different types of limited purpose public figures. There need not always be the public controversy which Plaintiffs refer to. If the person is a public performer, such as an entertainer or professional athlete, then that can be sufficient to transform the individual into a public figure. A number of cases have recognized this. In *Brewer v. Memphis Publishing Company, Inc.,* 626 F.2d 1238 (5th Cir. 1980), the court held that a former entertainer who had been on television and who had gained media exposure through a romantic relationship with Elvis Presley was a limited purpose public figure. Her husband, a former professional athlete, was also held to be one. In *Carson v. Allied News Co.,* 529 F.2d 206, 209-210 (7th Cir. 1976), the court found that Johnny Carson was an "all-purpose" public figure and that his wife was a limited purpose public figure. *See also, Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1280 (3d Cir. en banc 1979) (professional football player is limited purpose public figure). These cases recognize, in accordance with *Gertz,* that "those who by reason of the notoriety of their achievement or the vigor and success with which they seek the public's attention, are properly classed as public figures," *Gertz,* 418 U.S. at 342. Clearly, public performers, who sometimes generate intense public interest with the attendant access to public communication, are included within the category of limited purpose public figure even though there may not be an actual "controversy" as that term is commonly understood.

The leading New York case of *James v. Gannett Co., Inc.,* 40 N.Y.2d 415, 353 N.E.2d 834 (1976) is strikingly similar to the instant case and clearly illustrates that Plaintiffs are limited purpose public figures for purposes of comment on their performances and delivery service. In *James,* the plaintiff was a local Rochester, New York belly dancer who brought an action against a newspaper. The article com-

7

plained of was entitled Samantha's Belly Business," and was about the dancer's performance. It was based on an interview with the plaintiff. Plaintiff specifically objected to portions of the article containing quotations such as "men is my business" and alleged the article implied she engaged in illegal and immoral activities with men.

New York's highest court held that the belly dancer was a public figure because her pursuit of this "exotic specialty" aroused a certain public curiosity and invited attention and comment. *Id.* at 836. The court cited *Gertz, supra,* which defined public figures as persons who "have assumed roles of special prominence in the affairs of society." *James,* 353 N.E.2d at 839. In language especially relevant to this case, the court noted that the category of public figure is broad and there are various *types* of limited purpose public figures:

> The category of "public figures" is of necessity *quite broad. Included* without doubt, *are many types of public performers* such as professional athletes, nightclub and concert singers, television and movie actors, and recording artists. *Although such persons have not necessarily taken an active party in debates on public issues, they remain, nevertheless, persons in whom the public has continuing interest.*

*Id.* at 839 (emphasis added) (citation omitted). The court stated further:

> [T]he *essential element underlying the category of public figures is that the publicized person has taken an affirmative step to attract public attention.* . . . Thus, in this case, we have no doubt that the plaintiff *co-operated* in having the interview with defendant's reporter and was far from unhappy about any attendant notoriety. Her obvious purpose was to attract customers to the club where she was performing. A larger audience for her performances would be beneficial to her economic interest. *In short, the plaintiff welcomed publicity regarding her performances and therefore must be held to be a public figure with respect to newspaper accounts of these performances.* By her purposeful activity, she thrust herself into the public spotlight and sought a continuing public interest in her activities.

*Id.* at 840 (emphasis added) (citation omitted).

As in *James,* Plaintiffs in the instant case are public figures with regard to accounts or reviews of their performances. As will be seen below, Plaintiffs repeatedly solicited, welcomed, and co-operated in obtaining publicity about their performances, both before and after the column in question.

8

Another relevant decision is *Griffin v. Kentucky Post*, 10 Med. L. Rptr. 1159 (Ky. Cir. Ct. October 27, 1983). The plaintiff was a topless dancer at a local lounge who was arrested for not having an occupational license. The defendant newspaper reported the incident and inaccurately reported that plaintiff "pled guilty to nude dancing" when in fact she had only pled guilty to not having an occupational license. Plaintiff sued alleging that the article and inaccurate quote implied she was a woman of loose morals and criminal character. The court concluded that Plaintiff *was an entertainer* and therefore a public figure. Summary judgment was granted for defendant. *Id.* at 1160.

Numerous other cases hold that entertainers, sports figures, persons performing unique or special services, and the like are limited purpose public figures.[7]

Likewise, the undisputed evidence in this case clearly reveals that Plaintiffs are entertainers and persons who provided a unique service. Plaintiffs are well known in the community and repeatedly advertised and received publicity and public attention regarding their service. They are public figures for purposes of this lawsuit.

Faye Sepmeier admitted that she was well known around Tallahassee as the Leathergram lady. (F. Sepmeier I at 316-21). In response to a question as to how a particular individual recognized her, she stated, *"everyone knew I was the Leathergram lady."* (F. Sepmeier II at 76) (emphasis added). Charles Sepmeier, in response to a similar question, admitted that *"Everyone in town recognized her. She is not that hard to miss."* (C. Sepmeier II at 59) (emphasis added). When asked why everyone in town recognized her he attempted to limit his previous statement saying he had been too broad. But he nevertheless continued: *"she was well-known through her shows, from publicity prior to the Lindley article when she was on the front page of the Tallahassee Democrat."* (C. Sepmeier II at 59) (emphasis added). Mr. Sepmeier also indicated that Faye Sepmeier's performance created a great deal of attention when performed in public places. He stated it was not uncommon for persons to leave their seats to watch her show when she performed in the restaurants and bars. (C. Sepmeier II at 18-19).

Ms. Sepmeier was interviewed on radio at least twice regarding her

---

[7] The following is just a sampling. *See, e.g., Davis v. High Society*, 9 Med. L. Rptr. 1164, 457 N.Y.S. 2d 308 (N.Y. 1982) (woman boxer); *Rodriguez v. Nishiki*, 653 P.2d 1145, 9 Med. L. Rptr. 1349, (Haw. 1982) (various entertainers and musicians); and *Rood v. Finney*, 418 So.2d 1, 8 Med. L. Rptr. 2047, (La. Ct. App. 1982), *cert. denied*, 420 SO.2d 979 (1982), *cert denied*, 460 U.S. 1013 (1983) (professional golfer involved in unique and well publicized golf activities).

unique[8] Leathergram service. Both were before the Column appeared on May 20, 1983. The first was February 8, 1983 on WTNT of Tallahassee and the other was February 14, 1983 (Valentine's Day) for Florida Radio News Service.

The Sepmeiers were also interviewed and filmed by *Real People*, a show broadcasted nationally each week on NBC. The tape was apparently never aired, although there was a June 24, 1983 article in the *Democrat* regarding the show. The Sepmeiers did not charge NBC for their performance because it was to be on national TV. Mr. Sepmeier said "[w]e were real happy to have the opportunity to do it." (C. Sepmeier II at 99-10).

In addition, Plaintiffs were the subject of various newspaper articles that appeared locally and throughout the State of Florida both before and after the Column was published. Pictures of Mrs. Sepmeier performing her act also appeared in various newspapers throughout Florida. Several newspapers even published large, front-page photographs of Mrs. Sepmeier performing on a stage with Governor Graham at the annual Press Club skits. The Sepmeiers consented to and cooperated with this publicity.[9] Copies of these articles were attached to Defendants' First Request for Admissions to Plaintiffs (March 25, 1986).

At least *ten* articles appeared *prior* to the Column in question:

| Date | Newspaper |
|------|-----------|
| February 14, 1983 | *Gainesville Sun* |
| February 14, 1983 | *Florida Times Union* |
| February 14, 1983 | *Pensacola Journal* |
| February 17, 1983 | *Unidentified Florida newspaper* |
| March 30, 1983 | *Tallahassee Democrat* |
| March 30, 1983 | *Miami Herald* |

---

[8] Plaintiffs admitted that to the best of their knowledge, their Leathergram service was unique in Tallahassee, Florida and the United States. See Answers to Defendants First Request for Admissions to Plaintiffs, dated April 25, 1986.

[9] Plaintiffs have admitted that most of these publications are true and correct copies although they are without knowledge as to some of the specific dates or specific newspapers that articles appeared in. As to at least 5 of the 10 publications Plaintiffs admit the publication was authored with their consent and co-operation. *See* Response to Defendants' Request for Admissions dated April 25, 1986. In any event, most of the articles, photos, and captions on their face show they were done with knowledge and awareness and with the co-operation of Plaintiffs.

10

| March 30, 1983 | *Orlando Sentinel* |
| March 30, 1983 | *Florida Times Union* |
| March 31, 1983 | *Pensacola Journal* |
| April, 1983 | *Tallahassee Democrat* |

The following articles appeared *after* the Column in question:

| May 29, 1983 | *Orlando Sentinel* |
| June 24, 1983 | *Tallahassee Democrat* |
| June 29, 1983 | *Florida Flambeau* |
| Undated | *Florida Flambeau* |

See Appendices D and E to Defendants' Memorandum in Support of Motion for Summary Judgment. Plaintiffs have continued to solicit and receive publicity since moving to Colorado. An Aspen newspaper published an article in August, 1985 about their service. Plaintiffs placed an ad with the *Aspen Times* and also ran an ad in a magazine entitled *Air Destinations*. (C. Sepmeier I at 162-63).

Ms. Sepmeier did not object to the publicity or to the newspaper articles prior to the Column in question. (F. Sepmeier I at 187). In fact, she clipped copies of the articles that other people wrote about her. (F. Sepmeier I at 275-77). Ms. Sepmeier further stated that none of the articles (except the Lindley Column) had any false information in them. (F. Sepmeier I at 187-91).

In addition to these various newspaper articles and stories, the Plaintiffs actively advertised their business in various publications and on radio and television both before and after the Column in question. Fantasy Dancers, Inc. spent a minimum of 44,015.29 to advertise and promote their business in 1983. (Exhibit Z to Defendants' March 25, 1986 Request for Admissions). The following is a partial listing of the advertisements and companies that advertisement costs were paid to:

Tallahassee Democrat

TV Week

Various radio stations in Tallahassee

Group W Cable TV

WFSU TV

The Aspen Times

Air Destinations

Business to Business Magazine

WECA TV

State Capital News

WTNT

WTWC TV

See the Answers to Defendants' First Request for Admissions to Plaintiffs, dated April 25, 1986.

After the Column appeared, the Sepmeiers advertised in *Penthouse* magazine (F. Sepmeier I at 217-18; C. Sepmeier I at 160). The advertisement was for a poster of Ms. Sepmeier posing in her Leathergram outfit. A picture of the poster was included in the advertisement.

In addition, Charles Sepmeier issued a press release announcing the sale of a Leathergram franchise in Orlando. (C. Sepmeier I at 158-60). He donated a Leathergram performance to WFSU TV Auction for the dual purpose of supporting public television and advertising their business. (C. Sepmeier II at 41).

The fact that Plaintiffs actively solicited business through advertising is one indicia of their public figure status. *See, e.g., Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3d Cir. 1980) (company that extensively advertised through radio, television, and handbills for its sale of meat is public figure); *Novi Ambulance v. Farmington Observer,* 11 Med. L. Rptr. 1644 (Mich. Cir. Ct. Feb. 27, 1985) (ambulance service actively soliciting business through advertisements in yellow pages, newspapers, and handbills and establishing exclusive contracts with certain local communities was limited public figure for purpose of comments regarding its performance as ambulance service).

In addition to their numerous private performances (approximately 270 Leathergram order forms were produced by Plaintiffs in discovery), Plaintiffs performed their act in many public places in Tallahassee. Ms. Sepmeier danced at W. W. Dickens, Clyde's, Bennigan's, Simon Malone's, Brothers Three, Big Daddy's, Brown Derby, The Pub, and various other restaurants and bars in the Tallahassee area. She has also performed in other public places such as the Florida Bar Association and Florida State University. On several occasions she performed for professors, with one performance at Opperman Music Hall before a crowd of 800-900 people. Ms. Sepmeier received front page attention through Florida after joining Governor Graham on center stage at the Capital Dress Corps skits in 1983. A brief look at the 270 Leathergram order forms shows just how widespread the exposure was throughout the general public.

Both the Sepmeiers' own admissions and the undisputed facts show

12

that the Sepmeiers are unquestionably, as a matter of law, public figures for purposes of comment about the Leathergram performances.

By their own actions, Plaintiffs voluntarily subjected themselves to the media's commentary. The fact that Plaintiffs repeatedly obtained favorable media exposure both before and after the Column illustrates that unlike purely private persons, Plaintiffs had significant access to the media to rebut the allegedly defamatory statements. *Compare Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S. Ct. 2939, 86 L.Ed. 2d 593, 601 (1985).

(b) *The Standard of Proof Required to Show Actual Malice.*

As limited purpose public figures, Plaintiffs cannot recover unless they prove with *convincing clarity* that the Column was published with actual malice, that is with knowledge of falsity or reckless disregard for truth or falsity. *Gertz, supra.*

The concept of reckless disregard for the truth has been defined by the courts to require "a high degree of awareness of . . . probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The United States Supreme Court concluded:

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.*

*Id.* (emphasis added). A publisher must have "conscious doubts" regarding the truth or falsity of the statements. *Dun and Bradstreet v. O'Neill*, 456 S.W. 2d 896, 900 (Tex. 1970). Indifference to the truth is not enough to hold a publisher liable. *Dickey v. CBS, Inc.*, 441 F.Supp. 1133, 1141 (E.D. Pa. 1977), *aff'd*, 583 F.2d 1221 (3d Cir. 1978).[10]

From the inception of the actual malice concept, evidence of negligent reporting or editing has been insufficient to show actual malice. In *Oliver v. Village Voice, Inc.*, 417 F.Supp. 235 (S.D.N.Y. 1976), the court granted a defendant's summary judgment motion despite testimony that the reporter's source may have been unreliable and that the source's allegations previously had been denied in sworn testimony in another matter. The court stated:

---

[10] *See also Dacey v. Florida Bar, Inc.*, 427 F.2d 1292, 1295 (5th Cir. 1970), (applying Florida law) wherein the author falsely stated that plaintiff was convicted for the unauthorized practice of law. Nevertheless, summary judgment was granted because there was no evidence that the author had any knowledge or suspicion of the falsity of the statement nor was there any proof that he had any indication that his conclusions were incorrect.

To establish recklessness, it is not sufficient to show that the reporting in question was speculative or even sloppy. . . . The fact that the subject matter was speculative and statements in question controverted is not sufficient to permit the conclusion that "the defendant in fact entertained serious doubts as to the truth of his publication."

*Id.* at 238. In *New York Times, supra,* 376 U.S. at 288, the Court stated:

We think the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.

*Id.* This concept has been repeated in a number of cases, including *Washington Post Co. v. Keogh,* 365 F.2d 965, 971-73 (D.C. Cir. 1966), *cert. denied,* 388 U.S. 909 (1967); *Times Publishing Co. v. Huffstetler,* 409 So.2d 112, 113 (Fla. 5th DCA 1982); *Tavoulareas v. Piro,* 759 F.2d 90, 104, 114, *pet. for rehearing,* 763 F.2d 1472 (D.C. Cir. 1985).

Furthermore, the contents of a publication are not, by themselves, sufficient evidence to show actual malice. Evidence of actual malice must tend to prove defendant's state of mind, and this will always require proof outside the bounds of the article itself. In *Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341 (S.D.N.Y. 1977), the court stated that misquotations in the article are not sufficient to establish actual malice. The court concluded:

Even if there were a dozen errors in this article, mistakes or bad judgment will not substitute for knowing falsehood or reckless disregard as to falsity, when the uncontradicted testimony reveals that the author and publisher held the good faith belief that the article was correct and truthful.

*Id.* at 1350.

(c) *There is No Evidence of Actual Malice in the Record.*

In Defendants' Third Set of Interrogatories, Defendants specifically requested that, for those parts of Plaintiffs' complaint which allege that Defendants acted with malice, Plaintiffs detail the underlying factual basis for their claim and identify all persons possessing information of such and all witnesses who will testify to such. See Defendants' Third Set of Interrogatories, Nos. 2, 10, 11, 12 and 17.

In their answer, however, Plaintiffs identified only Mary Ann Lindley as the person possessing such information and based their claim of malice upon the "fact that the author composed and the Democrat

14

published such statements." (Plaintiffs' Answers to Defendants' Third Set of Interrogatories No. 2); "Lindley had seen the service on two different occasions and had seen the Machogram service and knew they were not the same and the the Plaintiff was not nude and that she did not strip. The fact that Lindley wrote these things anyway indicates her recklessness and willfulness in publishing false statements . . ." (Plaintiffs' Answer to Defendants' Third Set of Interrogatories, No. 10); ". . . It is assumed that superiors are responsible for the acts and omissions of their servants." (Plaintiffs' Answers, No. 11); "That the Democrat, with its employees being its collective reasoning and judgment published the article knowing full well the article was false as two messages had been delivered at the Democrat for Democrat personnel." (Plaintiffs' Answers, No. 12); and, "That Charles Sepmeier was not the Machogram man, never associated with Machogram and that Lindley knew this to be true but yet stated otherwise in the article. . ." (Plaintiffs' Answers, No. 17).

This is precisely the type of evidence that is insufficient to show malice under the above case law. Evidence must be presented to show the Defendants' state of mind, requiring proof outside the bounds of the article itself, which Plaintiffs have not done.

No evidence in the deposition or other pleadings on file in the instant action suggest that the Tallahassee Democrat or Mary Ann Lindley, the author of the Column, had any knowledge of falsity or "entertained serious doubts as to the truth of the publication," or had "conscious doubts" regarding truth or falsity. The remaining Defendants are individuals who worked at the Democrat and who had no direct personal involvement with the Column. See various affidavits of these individuals attached as Exhibit G to Defendants' Memorandum in Support of Motion for Summary Judgment.

Ms. Lindley was well trained and qualified to write the Column. She has worked with newspapers since age 16. From 1969 to 1983, she was an editorial writer, columnist and member of the editorial Board at the Democrat. She then became a full-time columnist for the Democrat. (Lindley at 4-6).

From the beginning, the editors discussed with Ms. Lindley the importance of being fair and accurate. They frequently discussed in the newsroom the importance of tone and the way it determines which words they choose. (Fuller at 13-14).

When Ms. Lindley was selected for her job, the editors talked extensively about what the paper wanted in the Column and what the Column should be. (Fuller at 12). They wanted someone who was good

**15**

with language, had good human instincts, and had maturity and professional experience and who had empathy for people. (Fuller at 10-12).

Ms. Lindley was not only well qualified, but also prepared well for the particular Column. In regard to preparation, Ms. Lindley testified she had casual conversations with many people concerning the Leathergram and the Machogram. (Lindley at 20-21). She witnessed a Machogram shortly before writing the Column. (Lindley at 35-37). She had previously witnessed two Leathergram performances. (Lindley at 27-28).

The Democrat's normal procedure was for two editors to review the Column prior to publication. (Lindley at 10-11; 22-23). Ms. Lindley wrote the Column on May 19, 1983, the day before it was published. (Lindley at 20). In accordance with the Democrat's procedure, the May 20, 1983 Column was reviewed by two editors who were on duty at the city desk that evening. (Lindley at 10, 22; Fuller at 6).

Ms. Lindley used care in writing the Column. She testified that she compared the performance to streaking only because "they were both slightly, to a greater or less extent, exhibitionist type fads." (Lindley at 33, 47-48).

As to the description of the Leathergram costume, Ms. Lindley testified that she was not trying to establish any degree of flesh being exposed and she did not wish her readers to infer an equivalency of the display of flesh among Machogram, Leathergram, and streakers. She had no apprehension at the time that she might be implying that. (Lindley at 58-59). By using the word "spandex" she was simply trying to convey that the woman was wearing a snug formfitting costume.

The Column does not identify any person, business, or corporation by name. Ms. Lindley deliberately did not write about business or corporate relationships because she was attempting to keep the Column to a generic discussion of fads. (Lindley at 52-53).

Clearly, there is no clear and convincing proof of actual malice in this record. Because there is no genuine issue of material fact regarding this issue, summary judgment is appropriate.

IV. *The Column is Privileged Fair Comment and The Evidence Shows There Was No Express Malice Which is Required to Overcome This Privilege.*

The second reason that final summary judgment should be entered against Plaintiffs is that the Column is protected by Florida's qualified privilege of fair comment. As discussed below, that privilege provides

16

that comment on matters of public or general concern is qualifiedly privileged, even assuming falsity of the comment. The qualified privilege can only be overcome by an affirmative showing of "express" malice; i.e., ill will, hostility, or evil intention to defame and injure. Here, there is no evidence of express malice or "actual" malice, and Defendants are entitled to summary judgment.

(a) *The Fair Comment Privilege.*

Whether a common law privilege is applicable in a case is a matter of law for the court. *See Nodar v. Galbreath,* 462 So.2d 803, 810 (Fla. 1984); *Bair v. Palm Beach Newspapers, Inc.,* 2 Fla. Supp. 2d 137 (15th Cir. Ct. 1982); *aff'd per curiam,* 444 So.2d 1131 (Fla. 4th DCA 1984).

Even assuming Plaintiffs are not public figures for constitutional purposes, they are nevertheless sufficiently newsworthy to be subject to Florida's qualified privilege of fair comment—fair comment based on what Plaintiffs have voluntarily done and the unique entertainment nature of their delivery service.

Florida's common law has historically recognized many circumstances in which communications are of sufficient importance to society to merit protection from lawsuits, except when the publication is improperly motivated. In *Abraham v. Baldwin,* 52 Fla. 151, 42 So. 591 (1906), the Florida Supreme Court stated:

A communication, although it contains criminating matter, is privileged when made in good faith upon any subject in which the party communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest, right, or duty, and made upon an occasion to properly serve such right, interest or duty, and in a manner and under circumstances fairly warranted by the occasion and the duty, right or interest and not so made as to unnecessarily or unduly injure another or to show express malice.

*Id.* at 592.

Two recent Florida Supreme Court cases make it clear that the common law privilege of fair comment, and other similar common law privileges, are still alive and well in Florida and may apply in a case such as this, even assuming the particular individual may not be a limited purpose public figure for federal constitutional purposes.

First, in *Miami Herald Publishing Co. v. Ane,* 458 So.2d 239 (Fla. 1984), the court, in response to a certified question, held that a private plaintiff was not required to prove that the defendant published alleged false and defamatory statements with "actual malice" as defined in

**17**

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), even though the matters related to an event of public or general concern. The court had been asked to establish, in Florida, a privilege to defame unless one could prove actual malice—that is, knowledge that the publication was false or reckless disregard for the truth. The court refused to do this but did not reject its prior cases regarding qualified privileges.

The *Ane* court made it clear that it was retaining fair comment and similar common law qualified privileges by stating:

[A]nd in *Gibson v. Maloney*, 231 So.2d 823, 826 (Fla. 1970), the privilege applied to make "'fair comment' on a public matter relating in part to an individual who had by choice made himself newsworthy and a part of the passing scene." We found the plaintiff to be a public figure under both the common law and *New York Times* standards.

As can be seen by the above examples, the common denominator of our "fair comment" qualified privilege has always been that the plaintiff was a government official, political candidate, or otherwise a public figure due to fame, associations, or similar considerations. Moreover, under Florida common law, the privilege was always defeated by express malice, a lesser standard than the actual malice urged by Petitioners. Petitioner would have us expand a lesser privilege into a much greater one. . .

*Id.* at 242. Thus, the court made it clear that in certain situations, where "additional factors," *Id.* at 241, were present such as in *Gibson v. Maloney*, the fair comment privilege would apply.

Three months later the Florida Supreme Court clarified the point in *Nodar v. Galbreath*, 462 So.2d 803 (Fla. 1984). In *Nodar*, a high school English teacher brought a slander action against a student's father based on comments made by the father at a school board meeting concerning her performance as a teacher. The court held that the statements (which were found to be defamatory by the jury) were conditionally privileged under several possible conditional privileges applicable under Florida law and that the plaintiff had failed to prove express malice. Similar to the instant case, the theory of the complaint was that the publication was a false and defamatory statement tending to impune plaintiff's abilities in connection with their business or profession and thus was slander per se. After holding that the Plaintiff was not a public official within the meaning of the *New York Times* rule, the court nevertheless held that there were several legal grounds for holding that the defendant's remarks were made upon a conditionally privileged occasion. The court noted that Florida embraces a broad

18

range of privileged occasions that have come to be recognized under Florida law citing Rahdert & Snyder, *Rediscovery Florida's Common Law Defenses to Libel and Slander*, 11 Stetson L. Rev. 1 (1981). After discussing several alternative privileges that apply, the court, in an important footnote, referred to the previous holding in *Ane* and stated:

> Yet another arguable ground would be the privilege of every person to express to other persons his fair comment and criticism on any public, governmental, political, social, or cultural matters. *Gibson v. Maloney*, 231 So.2d 823 (Fla. 1970); *White v. Fletcher*, 90 so.2d 129 (Fla. 1956); *Abram v. Odham*, 89 So. 2d 334 (Fla. 1956); *McClellan v. L'Engle*, 74 Fla. 581, 77 So. 270 (1917). Although we recently said that there is no qualified privilege "to defame a private person merely because the defamatory communication is directed to a matter of public or general concern," *Miami Herald Publishing Co. v. Ane*, at 241, we acknowledged that past cases had recognized the privilege of fair comment where there were "additional factors." We need not decide whether this case presents such additional factors because there are numerous other grounds of privilege.

*Id.* at 810, note 5. Thus, the court made it clear that the privilege of every person to express to other persons his fair comment and criticism on any public, governmental, political, *social, or cultural matters* was still alive and well in Florida where there were such "additional factors" as illustrated by the cases cited in the quote above.

The instant case contains the same sort of "additional factors" which were present in *Gibson v. Maloney, White v. Fletcher,* and *Abram v. Odham* cited in note 5 of the *Nodar* opinion. Just as in those cases, Plaintiffs here have actively thrust themselves into a matter of public concern involving social or cultural matters.

For instance, *Gibson* held that absent express malice, comment on matters of public or general concern is qualifiedly privileged, *even if based on falsehood*. The court stated: "[t]he comment made by Gibson was 'fair comment' on a public matter relating in party to an *individual who had by choice made himself newsworthy and a part of the passing scene*." *Id*. at 826. A person becomes newsworthy when he, "*whether willingly or not*, becomes an actor in an occurrence of public or general interest, he emerges from his seclusion. . . .' " *Id*. at 825, *quoting Jacova v. Southern Radio and Television Co.*, 83 So.2d 34, 36 (Fla. 1955).[11]

Similarly, in *Time, Inc. v. Firestone*, 271 So.2d 745 (Fla. 1972), *on*

---

[11] The Florida Court adopted a common law qualified privilege of fair comment on a newsworthy subject of public interest. And, by adopting *Jacova's* "unwilling actor"

**19**

*remand*, 279 So.2d 389 (Fla. 4th DCA 1973), *rev'd after remand on other grounds*, 305 So.2d 172 (Fla. 1974), *rev'd on other grounds*, 424 U.S. 448 (1976), the Florida Supreme Court listed events that would qualify for protection:

> Most obvious, of course, are matters relating to governmental affairs, which necessarily involve public officers, public servants and employees and even candidates for public office. . . .
>
> But *public concern is not limited to matters governmental. . . .* Thus, it appears it can be broadly said that matters of real public or general concern are those which invoke common and predominant public activity, participation or indulgence, and cogitation, study and debate; and *they include such matters as sporting events, the performing and fine arts, morality,* and religion, the sciences, *and matters relating generally to the health, well being and general comfort of the public* as a whole. Accordingly, news items or featured articles or *commentaries* by communication media relating to these matters are and should be constitutionally protected *notwithstanding that obscure or prominent individuals may be caught up in the current and regretfully defamed.*

271 So.2d at 748-49 (emphasis added) (citations omitted).

The court held, however, that the divorce cases that formed the context of the libel suit in *Firestone I* was a matter of "prurient curiosity," 271 So.2d at 752, not "real public or general concern." *Id.* Clearly, the Florida Supreme Court's decisions in *Firestone I* left the common law privilege it established in *Gibson* undisturbed. If anything, *Firestone* strengthens *Gibson* by reaffirming a privilege for comment on matters of public or general concern. *See* Rahdert & Snyder, *Rediscovery Florida's Common Law Defenses to Libel and Slander*, 11 Stetson L. Rev. 1, 46 (1981).

In 1974, the Court again dealt with the *Firestone* case in *Firestone v. Time, Inc.*, 305 So.2d 172 (Fla. 1974). The important aspect of the

---

standard into libel law, the court determined that the existence of the privilege should depend on the public concern about the event. This privilege seems to echo the "public interest or concern" standard of the United States Supreme Court plurality in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971). It should be noted that *Gibson* was decided in early 1970, more than a year before the *Rosenbloom* judgment. While the United States Supreme Court abandoned *Rosenbloom's* constitutional "public interest or concern" test in *Gertz*, 418 U.S. at 323, *Gibson's* common law qualified privilege of fair comment on matters of public concern is still the applicable law in Florida. Florida's position is permissible due to *Gertz* allowing the states such discretion. *Id.* at 347-48. See Rahdert & Snyder, *Rediscovery Florida's Common Law Defenses to Libel and Slander*, 11 Stetson L. Rev. 1 (1981).

20

*Firestone II* opinion is its handling of the options available to a state court following the decision in *Gertz* which, as explained earlier, allowed the state courts to fashion libel laws in certain cases. In *Firestone II* the court did not abandon either the "matters of general concern" or "fair comment" test and, indeed, adhered to that in *Firestone I*. *Firestone*, 305 So. 2d at 175. The error made by the Florida Supreme Court in the second *Firestone* case is that the court ultimately allowed recovery without proof of fault. This led to reversal by the United States Supreme Court. *Firestone*, 424 U. S. at 448. In fact, neither the United States Supreme Court nor any other court has displaced the tests announced in *Firestone I* and *Gibson*.

Likewise, as discussed herein, Plaintiffs not only performed the Leathergram in many public places, but also solicited and received publicity both locally and throughout the State. They invited public attention and the Column about them is protected by the "fair comment" privilege.

(b) *Standard of Proof Required to Overcome Qualified Privilege.*

If a defendant's defamatory remark is qualifiedly privileged, "[t]he burden of proof is changed, and, in order for the plaintiff to recover, he is called upon affirmatively and expressly to show express malice in the publisher." *Coogler v. Rhodes*, 38 Fla. 240, 21 So. 109, 112 (1897); *White v. Fletcher*, 90 So.2d 129, 131 (Fla. 1956). Express malice cannot be inferred merely from the fact that the statements are untrue. *Nodar v. Galbreath*, 462 So.2d 803, 810 (Fla. 1984), citing *Coogler*, 21 So. at 112.

If the defamer is motivated by a desire to protect the qualified interest, he does not forfeit the privilege merely because he also in facts feels hostility of ill will towards the plaintiff. The incidental gratification of personal feelings of indignation is not sufficient to defeat the privilege where the primary motivation is within the scope of the privilege. *Nodar*, 462 So.2d at 812.

*Nodar* clearly illustrates that the showing of express malice necessary to overcome the common law privilege as is at issue here, is present only where the "*primary motive* for the statement is shown to have been an intention to injure the plaintiff." *Id*. at 806. (emphasis added). The court there noted:

Strong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position "to gratify his malevolence." If the occasion of the communication is privileged because of a proper interest to be protected, and the defamer is motivated by a desire to protect that

21

interest, he does not forfeit the privilege merely because he also, in fact, feels hostility or ill will toward the plaintiff. . . . The incidental gratification of personal feelings of indignation is not sufficient to defeat the privilege where the primary motivation is within the scope of the privilege.

*Id.* at 811-12 (citations omitted).

Thus, it is incumbent on Plaintiffs to come forward and show *proof* of express malice. This they have totally failed to do.

(c) *There is No Evidence of Express Malice in This Record.*

There is no evidence whatsoever in this record of any express malice on the part of anyone at the Democrat.

Mary Ann Lindley testified she had not met and does not know either Faye or Charles Sepmeier and has no reason to hold ill will against either of them. (Lindley at 63-64). Ms. Lindley's training and her preparation and care used in writing the Column (see point III(c) above) also establish a complete lack of express malice.

The affidavits of each of the individual defendants show that neither the Democrat nor any individual Defendant had any express malice. Each affidavit states in part:

I do not, nor have I ever, harbored any ill will, hatred, malice, spite, enmity or other similar sinister or corrupt motives or feelings toward Plaintiff Faye F. Sepmeier, Plaintiff Charles W. Sepmeier, or Plaintiff Fantasy Dancers, Inc. Furthermore, I have never had any reason to have any such sinister or corrupt motives or feelings towards any of the above-mentioned Plaintiffs.

Plaintiffs themselves have offered absolutely no evidence of malice. Faye Sepmeier has testified she knows of no one at the Democrat who bears any ill will or hatred towards her. (F. Sepmeier I at 221). She has never met Mary Ann Lindley, Bill Fullter, Bill Mansfield, or Carrol Dadisman. She has met Walker Lundy only briefly. She has never talked to any of those individuals except Walker Lundy. She has no contacts nor knows of anyone who works at the Tallahassee Democrat (F. Sepmeier I at 98-100).

Similarly, Charles Sepmeier admitted he has never met Mary Ann Lindley, Bill Fuller, Carrol Dadisman or Bill Mansfield. He has only brief talked with Walker Lundy and Mary Ann Lindley, *after* the article in question. (C. Sepmeier I at 56-57). He knew of no one at the Democrat at the time the Column was published, and he further admitted he does not personally know of anyone at the Democrat who

22

has any ill will or hatred or contempt for him. (C. Sepmeier I at 66-69).

The evidence is clear that Defendants (sic) Plaintiffs harbored no ill-will or hostility toward Plaintiffs. Plaintiffs have not produced any evidence to the contrary and have failed to create a genuine issue of material fact. Thus, Defendants are entitled to summary judgment as a matter of law.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED AND ADJUDGED that the Defendants' Motion for Summary Judgment is granted.

DONE and ORDERED this 9th day of September, 1986.